James R. O'CONNER, Plaintiff–Appellant,

v.

COMMONWEALTH EDISON COMPANY and London Nuclear Services, Inc., Defendants–Appellees,

and

United States of America, Intervenor–Appellee.

No. 92–2989.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1993.

Decided Jan. 7, 1994.

Jerelyn D. Maher (argued), Jay H. Janssen, Janssen, Becker, Maher & Wertz, Peoria, IL, USA for James R. O'Conner.

Rex K. Linder, Heyl, Royster, Voelker & Allen, Peoria, IL, USA Richard F. Nelson, Rooks, Pitts & Poust, Chicago, IL, Donald E. Jose (argued), David Wiedis, Jose & Wiedis, West Chester, PA, for Commonwealth Edison Co.

William P. Barr, Office of U.S. Atty. Gen., Michael J. Singer, Patricia Ann Millett (argued), Dept. of Justice, Civ. Div., Appellate

Section, Washington, DC, J. William Roberts, U.S. Atty., Springfield, IL, for U.S.

Before RIPPLE and MANION, Circuit Judges, and SHADUR, District Judge.*

RIPPLE, Circuit Judge.

James O'Conner originally brought this suit in Illinois state court. He sought damages for personal injuries allegedly caused by unsafe dosages of radiation. Shortly before trial, the action was removed to federal district court under the Price–Anderson Amendments Act, 42 U.S.C. §§ 2014, 2210 (the "Amendments Act"). Defendants Commonwealth Edison Co. ("Commonwealth Edison") and London Nuclear Services ("London Nuclear") then moved for summary judgment. The district court granted the defendants' motion. Mr. O'Conner appealed. We now affirm.

## I

## BACKGROUND

A. *Facts*

Mr. O'Conner was a pipefitter who performed work in September and October of 1983 at a nuclear facility operated by Commonwealth Edison. During this period, Mr. O'Conner was employed by Morrison Construction Company, a subcontractor at the plant. At the time of his alleged overexposure, he was performing services for London Nuclear, a contractor of the plant. His actions while at the plant were controlled extensively by Commonwealth Edison because his particular pipefitting work was performed in areas containing radioactive materials. These areas were designated as radiation controlled areas and access was limited to only those radiation workers who had been trained specially to work in such an area. Mr. O'Conner had received training as a radiation worker. Even after this training, however, he was required to read and sign a Radiation Work Permit before he could enter a radiation controlled area. The work permit reported the actual levels of radiation in the area and specified how the worker must dress and what radiation measuring devices the worker must wear while doing work in the area. Mr. O'Conner adhered to these requirements at all times while in the area.

At the time Mr. O'Conner allegedly was overexposed to radiation, he was wearing three different types of dosimeters, scientific instruments that measure radiation dosage. According to the dosimeters, Mr. O'Conner received a dose of 45 millirems on the night of the alleged excessive dose. Federal regulations allow a worker to receive 12,000 millirems (or 12 rems) of radiation per year. Mr. O'Conner never defines what he considers to be an "excessive dose" but claims that he was overexposed because he felt warm while working. About ten months later, Mr. O'Conner was diagnosed with early posterior subcapsular cataracts by Dr. Karl Scheribel. It is Dr. Scheribel's opinion that the cataracts were caused by radiation because radiation-induced cataracts are so unique that they can be identified merely by observation. However, all experts agree that the minimum dose necessary to cause cataracts is 200 rems, well above the .045 rem dose that Mr. O'Conner received on the night of October 3, 1983.

In 1985, Mr. O'Conner brought this action in the Circuit Court of the Tenth Judicial Circuit of Illinois, Tazewell County. In a two-count complaint, Mr. O'Conner alleged that he had been exposed negligently to radiation as a result of the pipe-flushing procedure being conducted by London Nuclear for Commonwealth Edison. Just prior to trial, however, Congress enacted the Price–Anderson Amendments Act of 1988. The Amendments Act expanded federal jurisdiction for public liability actions to encompass "any legal liability arising out of or resulting from a nuclear incident or precautionary evacuation." 42 U.S.C. § 2014(w). The Amendments Act also allowed for removal of public liability actions currently pending in state courts. Pursuant to this second provision, the defendants filed a Petition for Re-

---

* The Honorable Milton I. Shadur, District Judge of the United States District Court for the North-

ern District of Illinois, is sitting by designation.

moval. The petition was granted over Mr. O'Conner's objection.

## B. *District Court Proceedings*

In the district court, the defendants moved for a determination of the legal duty owed to Mr. O'Conner under the Amendments Act. The district court determined that the maximum permissible radiation dose levels set by federal safety standards provide the applicable standard of care. Furthermore, the district court opined, even if Illinois would not use federal safety standards as the standard of care in this situation, a different state standard would be preempted by federal law. *O'Conner v. Commonwealth Edison Co.*, 748 F.Supp. 672, 678 (C.D.Ill.1990).

Mr. O'Conner then filed a motion asking the district court to remand the case to state court. He argued that the Amendments Act unconstitutionally conferred jurisdiction on the federal courts. He further argued that the retroactive application of these provisions violated due process. The district court disagreed. It held that Congress had created the public liability cause of action as a federal cause of action with a state law basis, similar to what Congress had done in the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 [OCSLA]. Furthermore, the district court believed that the other federal ingredients of the statutory scheme provided a sufficient basis for federal jurisdiction under the broad tests of *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), and *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). The district court also held that removal did not violate due process. Because the Amendments Act is essentially economic legislation, the district court determined that "[t]he validity of ... the removal mechanism ... depends on whether such retroactive application is a rational means of achieving a legitimate congressional purpose." *O'Conner v. Commonwealth Edison Co.*, 770 F.Supp. 448, 456 (C.D.Ill.1991). The district court determined that retroactive application of the removal provisions was a rational means to accomplish congressional purposes.

Prior to these motions, the defendants had moved for summary judgment on the ground that there was no evidence that the plaintiff had received a dose in excess of the federal permissible dose limits, and on the ground that there was no evidence that the plaintiff's occupational radiation exposure caused any injuries to the plaintiff. The plaintiff filed his response, which included the deposition testimony of Dr. Karl Scheribel. Dr. Scheribel testified that only radiation could have caused the plaintiff's cataracts. However, Dr. Scheribel did not include an affidavit that explained the basis of his opinion with respect to causation. The plaintiff was allowed to file supplemental affidavits and information regarding the basis of Dr. Scheribel's opinion. Mr. O'Conner filed a short affidavit from Dr. Scheribel which listed the names of four articles that formed the scientific basis of his opinion. Based on these representations, the district court first denied the defendants' motion for summary judgment on the ground that a genuine issue of material fact existed regarding whether the plaintiff had received a dose in excess of the federal dose limits. However, on August 29, 1991, after reconsidering the issue of admissibility of Dr. Scheribel's testimony sua sponte, the district court determined that Dr. Scheribel's testimony was inadmissible and entered judgment in favor of the defendants.

Mr. O'Conner appeals from the entry of summary judgment. 807 F.Supp. 1376. He renews on appeal the arguments made to the district court. Specifically, he alleges that the district court erred in not remanding the case to the state court and in applying the Amendments Act retroactively. He also maintains that the district court improperly determined the applicable standard of care for a public liability action. Finally, Mr. O'Conner reasserts the admissibility of Dr. Scheribel's testimony to establish causation. We address each of these in turn.

## II

## ANALYSIS

### A. *Jurisdiction*

The plaintiff first maintains that the district court should have remanded the case to

the state court. Mr. O'Conner argues that 42 U.S.C. § 2210(n)(2), which allows for removal of public liability actions, does not create a federal cause of action and is therefore a hollow grant of federal jurisdiction. Specifically, Mr. O'Conner maintains that, because the governing law for public liability actions is derived from state law rather than from a newly-created body of federal law, the cause of action does not arise under a law of the United States; instead, the public liability action arises under state law. Consequently, the removal provisions do not satisfy the requirement of Article III that causes of action "arise under" the Constitution or laws of the United States.

### 1.

In order to evaluate properly its constitutionality, we must look at the Amendments Act in the context of the entire federal statutory scheme on nuclear power. The Amendments Act is simply the last addition to the federal law of nuclear energy that has been evolving since 1946 when Congress enacted the Atomic Energy Act. The Atomic Energy Act initially gave the federal government a monopoly with respect to the development of nuclear power. Later, however, Congress determined that the national interest would be served by including the private sector in the development of atomic energy. Thus, Congress enacted the Atomic Energy Act of 1954 which established the Atomic Energy Commission and gave it authority to license and regulate nuclear facilities. *See* 42 U.S.C. §§ 2011–2281. However, this legislation alone did not spur the private sector into the industry. "[S]pokesmen for the private sector informed Congress that they would be forced to withdraw from the field if their liability were not limited by appropriate legislation." *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 64, 98 S.Ct. 2620, 2626, 57 L.Ed.2d 595 (1978). Congress responded in 1957 with the Price–Anderson Act for the purpose of "protect[ing] the public and ... encourag[ing] the development of the atomic energy industry." 42 U.S.C. § 2012. The Price–Anderson Act had three main features: 1) It "established a limit on the aggregate liability of those who wished to undertake activities involving the handling or use of radioactive materials"; 2) It channelled public liability resulting from nuclear incidents to the federal government; and 3) It established that all public liability claims above the amount of required private insurance "protection would be indemnified by the Federal Government, up to the aggregate limit on liability." S.Rep. No. 218, 100th Cong., 1st Sess. 2 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1476, 1477 [hereinafter S.Rep. No. 218].

In 1966, the Price–Anderson Act, due for expiration, was extended for ten years. In addition, a new provision required that those indemnified waive common law defenses in the event of an action arising from an extraordinary nuclear occurrence ("ENO"). "The 1966 Amendments also provided for the transfer, to a federal district court, of all claims arising out of an [ENO]. 42 U.S.C. § 2210(n)(2)." *In re TMI Cases Consolidated II*, 940 F.2d 832, 852 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). These provisions were premised on

> congressional concern that state tort law dealing with liability for nuclear incidents was generally unsettled and that some way of insuring a common standard of responsibility for all jurisdictions—strict liability— was needed. A waiver of defenses was thought to be the preferable approach since it entailed less interference with state tort law than would the enactment of a federal statute prescribing strict liability.

*Duke Power*, 438 U.S. at 65–66, 98 S.Ct. at 2626.

The Price–Anderson Act was amended a second time in 1975 and again in 1988 by the Amendments Act. The decision to amend and extend the Price–Anderson Act arose from congressional recognition that

> [t]he Price–Anderson System, including the waiver of defenses provisions, the omnibus coverage, and the predetermined sources of funding, provides persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over the procedures and standards of recovery that might otherwise be applicable under State tort law. The Act also

provides a mechanism whereby the federal government can continue to encourage private sector participation in the beneficial uses of nuclear materials.

S.Rep. No. 218 at 4. Among other provisions, the Amendments Act expanded the reach of 42 U.S.C. § 2210(n)(2) to provide for removal of, and original federal jurisdiction over, claims arising from any "nuclear incident," instead of actions arising only from ENOs. The amended section reads:

> With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place, or in the case of a nuclear incident taking place outside the United States, the United States District Court for the District of Columbia, shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy. Upon motion of the defendant or of the Commission, or the Secretary, as appropriate, any such action pending in any State court (including any such action pending on [the date of the enactment of the Price–Anderson Amendments Act of 1988]) or United States district court shall be removed or transferred to the United States district court having venue under this subsection. Process of such district court shall be effective throughout the United States.

42 U.S.C. § 2210(n)(2). The Amendments Act also added § 2014(hh) to the definition section. This section defines a public liability action as "any suit asserting public liability." [1] In addition to defining the cause of action, this section grants federal courts jurisdiction to adjudicate public liability claims:

> A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.

42 U.S.C. § 2014(hh). This provision of the Amendments Act was designed to overturn decisions in which the Third Circuit had held that "federal courts do not have subject matter jurisdiction for claims arising out of a non-ENO nuclear incident. *Stibitz v. GPU*, 746 F.2d 993 (3d Cir.1984), cert. denied, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985)." S.Rep. No. 218 at 13. The Senate Committee on Environment and Public Works made clear in its report, as well as in the language of the statute, that the new cause of action arose under the Act: "Any suit asserting public liability shall be deemed to be an action arising under the Price–Anderson Act." *Id.*

Although the public liability cause of action is built around preexisting state law, it contains some distinctively federal elements as well. The Amendments Act dictates the limitations period for a public liability cause of action, 42 U.S.C. § 2210(n)(1), provides for venue, § 2210(n)(2), limits the availability of punitive damages in an action arising out of an ENO, § 2210(s), and mandates that normally-available defenses be waived in the cases of ENOs, § 2210(n)(1). The Amendments Act, therefore, forms the state-based cause of action into the federal mold.

Thus, the Amendments Act is the latest installment in nearly fifty years of congressional work. During that time, Congress has attempted to encourage the development of domestic nuclear power to the fullest extent through licensing, indemnification, limitation of liability, and consolidation of litigation. Nevertheless, Congress has balanced this encouragement of private sector activity with

---

1. The definition of public liability, "any legal liability arising out of or resulting from a nuclear incident or precautionary evacuation," 42 U.S.C. § 2014(w), was not affected by the 1988 amendments. Although the definition of nuclear incident was altered slightly by the Amendments Act, the parts of that definition pertinent to this case remained constant:

> The term "nuclear incident" means any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material. . . .

42 U.S.C. § 2014(q).

an acute concern for public safety by authorizing extensive regulation first by the Atomic Energy Commission, and now by the Nuclear Regulatory Commission, and by imposing a carefully constructed measure of liability should nuclear accidents occur. It is against this statutory background that challenges to the constitutionality of the Amendments Act must be evaluated. We turn now to that constitutional issue.

### 2.

#### a. the constitutional standard

■ The Constitution of the United States confers limited jurisdiction on the federal courts. Article III provides that the judicial power of the United States "shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." Causes of action that are based entirely on federal law clearly arise under the laws of the United States for Article III purposes. However, when state and federal elements are present in the same cause of action, the analysis is necessarily more complex. We therefore turn to an examination of the caselaw discussing Article III "arising under" jurisdiction[2] in situations presenting both state and federal law questions.

Our analysis begins with *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), in which the Supreme Court first articulated the constitutional test for Article III "arising under" jurisdiction. *Osborn* involved a suit brought by the bank to prevent Ohio's state auditor from collecting a tax levied against the bank. The statute which had incorporated the bank also authorized it "to sue and be sued ... in any Circuit Court of the United States." *Id.* at 817. The Court held that the act of incorporation made the case one "arising under" the laws of the United States. In doing so, the Court articulated the following oft-quoted standard: "[It is a] sufficient foundation for jurisdiction, that the title or right set up by the party, may be defeated by one construction of the constitution or law of the United States, and sustained by the opposite construction...." *Id.* at 822. The presence of a state law issue did not destroy federal jurisdiction. When federal law, continued the Court, "forms an ingredient of the original cause, it is in the power of Congress to give the Circuit Courts jurisdiction of that cause, although other questions of fact or law may be involved in it." *Id.* at 823. As Judge Mansmann wrote for the Third Circuit in *In re TMI Cases Consolidated II,*

> The central teaching of *Osborn,* therefore, is that a case cannot be said to arise under a federal statute where that statute is nothing more than a jurisdictional grant. In order to confer "arising under" jurisdiction, "the act [may] not stop with incorporating the Bank;" it must do more.

940 F.2d 832, 849 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992).

More recently, the Court has addressed the issue of "arising under" jurisdiction in *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). In *Verlinden,* the Court evaluated the constitutionality of the Foreign Sovereign Immunities Act ("FSIA"), which authorizes a foreign plaintiff to sue a foreign state in

---

**2.** The "arising under" language also appears in the statute which authorizes district courts to hear cases involving federal questions. It states: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Although they contain identical language, the two provisions have been interpreted differently.

> Section 1331 ... although broadly phrased, has been continuously construed and limited in light of the history that produced it, the demands of reason and coherence, and the dictates of sound judicial policy which have emerged from the [statute's] function as a provision in the mosaic of federal judiciary legislation.

*Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 495, 103 S.Ct. 1962, 1972, 76 L.Ed.2d 81 (1983) (quoting *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 379, 79 S.Ct. 468, 484, 3 L.Ed.2d 368 (1959)). The statutory grant is much narrower than the constitutional grant. Under the statutory grant, a case arises under federal law only if, from the face of the plaintiff's complaint, it is apparent that the plaintiff's cause of action was created by federal law. *Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908).

federal district court on a nonfederal cause of action. However, this jurisdiction is contingent upon the district court's finding that one of the statutorily prescribed exceptions to foreign sovereign immunity applies. In evaluating the FSIA's constitutionality, the Court first reviewed the standard established in *Osborn:*

> *Osborn* . . . reflects a broad conception of "arising under" jurisdiction, according to which Congress may confer on the federal courts jurisdiction over any case or controversy that might call for the application of federal law. . . . It has been observed that, taken at its broadest, *Osborn* might be read as permitting "assertion of original federal jurisdiction on the remote possibility of presentation of a federal question." We need not now resolve the issue or decide the precise boundaries of Art. III jurisdiction, however, since the present case does not involve a mere speculative possibility that a federal question may arise at some point in the proceeding. Rather, a suit against a foreign state under this Act necessarily raises questions of substantive federal law at the very outset, and hence clearly "arises under" federal law, as that term is used in Art. III.

*Id.* at 492–93, 103 S.Ct. at 1971. The FSIA requires federal courts, in the first instance, to determine whether one of the enumerated exceptions to foreign sovereign immunity applies. Only if an exception applies is jurisdiction appropriate. This determination, held the Court, is sufficient for "arising under" jurisdiction. There is more than a "speculative possibility" that a federal question may arise. *Verlinden,* 461 U.S. at 492, 103 S.Ct. at 1971.

The Court then contrasted the circumstances in which "arising under" jurisdiction would be lacking. It distinguished the FSIA from acts which, without any other exercise of federal legislative power, merely grant jurisdiction to the federal courts. The Court stated:

> As the Court stated in *The Propeller Genessee Chief:* "The law . . . contains no regulations of commerce. . . . *It merely confers a new jurisdiction on the district courts; and this is its only object and purpose.* . . . It is evident . . . that Congress, in passing [the law], did not intend to exercise their power to regulate commerce. . . ."
>
> In contrast, in enacting the Foreign Sovereign Immunities Act, Congress expressly exercised its power to regulate foreign commerce, along with other specified Art. I powers. As the House Report clearly indicates, the primary purpose of the Act was to "se[t] forth comprehensive rules governing sovereign immunity"; the jurisdictional provisions of the Act are simply one part of this comprehensive scheme. The Act thus does not merely concern access to the federal courts. Rather, it governs the types of actions for which foreign sovereigns may be held liable in the United States, federal or state.

*Id.* at 496–97, 103 S.Ct. at 1973 (citations omitted).[3]

▮▮▮ Thus, more than a jurisdictional grant is required for a matter to "arise under" the Constitution or laws of the United

---

**3.** The Court in *Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989), discussed further the idea of a purely jurisdictional statute. In *Mesa,* the Court reviewed whether allegation of a federal defense was a prerequisite to removal under the federal officer removal statute, 42 U.S.C. § 1442(a)(1). The government urged that the statute permitted removal " 'whenever a federal official is prosecuted for the manner in which he has performed his duties. . . .' " *Mesa,* 489 U.S. at 125, 109 S.Ct. at 963. The Court disagreed. It held that the federal officer removal statute was a purely jurisdictional statute

seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant. Section 1442(a), therefore, cannot independently support Art. III "arising under" jurisdiction. Rather, it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes.

*Id.* at 136, 109 S.Ct. at 968. The court preserved the test, articulated in both *Osborn* and *Verlinden,* that Article III requires only a federal ingredient: "Nor is it any objection that questions are involved which are not all of a Federal character. If one of the latter exist, if there be a single such ingredient in the mass, it is sufficient [for constitutional purposes]." *Id.* at 129, 109 S.Ct. at 964 (quoting *The Mayor v. Cooper,* 73 U.S. (6 Wall.) 247, 252, 18 L.Ed. 851 (1867)).

States. Congress may not simply invoke federal jurisdiction; however, when it invokes this jurisdiction in conjunction with exercising its Article I legislative powers, the constitutional concerns are satisfied. As the Third Circuit held, "We take from *Verlinden* the proposition that where Congress has the authority to legislate in a given area and substantively does so, a grant of federal subject matter jurisdiction will survive an Article III challenge." *In re TMI Cases Consolidated II*, 940 F.2d 832, 850 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992).

### b. application

■ Because we believe that the Amendments Act embodies substantive federal policies and does not merely create federal jurisdiction for a state claim, we must conclude that Article III's "arising under" requirement has been met. At the outset, we believe it is important to note that Congress explicitly considered the constitutionality of its course of action. The House Committee on Interior and Insular Affairs specifically addressed possible constitutional concerns:

> The Committee recognizes, of course, that Article III of the Constitution limits the types of cases that federal courts created under that Article may hear. For this reason, H.R. 1414 expressly states that any suit asserting public liability shall be deemed to be an action arising under the Price–Anderson Act, thereby making suits asserting public liability "Cases * * * arising under * * * the Laws of the United States" within the meaning of Article III.... The Committee believes that conferring on the Federal Courts jurisdiction over claims arising out of all nuclear incidents in this manner is within the Constitutional authority of Congress....

H.R.Rep. No. 104, 100th Cong., 1st Sess., pt. 1. "The customary deference accorded the judgments of Congress is certainly appropriate where, as here, Congress specifically considered the question of the Act's constitution-

ality." *Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981).

Given the strong presumption in favor of Congress' carefully considered decisions as to the constitutionality of its pronouncements and the scope of "arising under" jurisdiction established in the caselaw, we conclude that the Amendments Act constitutionally vests the district court with jurisdiction. The federal basis of the Amendments Act is at least as strong as that in *Verlinden*. Two provisions of the Amendments Act demonstrate that a public liability action "arises under" the Price–Anderson Act. First, the broad definition of "public liability action" [4] embodied in the Price–Anderson Act implies that Congress has exercised power under Article I and has enacted a new and independent, indeed exclusive, cause of action. As the Third Circuit explained in its discussion of the jurisdictional grant of the Amendments Act:

> Under the terms of the Amendments Act, the "public liability action" encompasses "*any*" legal liability" of any "person who *may* be liable" on account of a nuclear incident. 42 U.S.C. § 2014(h) (emphasis added). Given the breadth of this definition, the consequence of a determination that a particular plaintiff has failed to state a public liability claim potentially compensable under the Price–Anderson Act is that he has no such claim at all. After the Amendments Act, no state cause of action based upon public liability exists. A claim growing out of any nuclear incident is compensable under the terms of the Amendments Act or it is not compensable at all. Any conceivable state tort action which might remain available to a plaintiff following the determination that his claim could not qualify as a public liability action, could not be one based on "any legal liability" or "any person who may be liable on account of a nuclear incident."

*In re TMI Cases Consolidated II*, 940 F.2d 832, 854 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). Thus, a state cause of action is not merely

---

**4.** *See supra* note 1 for the definition of "public liability" and the equally broad definition of "nu-

clear incident" which it encompasses.

transferred to federal court; instead, a new federal cause of action supplants the prior state cause of action.

Furthermore, Congress provided that the law governing a public liability cause of action was to be "derived from" state law. In creating the public liability cause of action, Congress specified:

> The term "public liability action", as used in section 2210 of this title, means any suit asserting public liability. A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the state in which the nuclear incident involved occurs, unless such law is inconsistent with the provision of such section.

42 U.S.C. § 2014(hh). Congress did not adopt in wholesale fashion state law. State law serves as the basis for the cause of action only as long as state law is consistent with the other parts of the Act. Congress desired that state law provide the content for and operate as federal law; however, Congress recognized that state law would operate in the context of a complex federal scheme which would mold and shape any cause of action grounded in state law. This recognition is explicit in the Amendments Act's legislative history. In discussing the need for reauthorizing the Price–Anderson Act, the Senate Committee on Environment and Public Works reported:

> The Price–Anderson system, including the waiver of defenses provisions, the omnibus coverage, and the predetermined sources

of funding, provides persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over the procedures and standards for recovery that might otherwise be applicable under State tort law.

S.Rep. No. 218 at 4. Thus, although the basis for a public liability cause of action is state law, the applicable law is only "derived" from state law. The Price–Anderson system, by design, alters state tort law to forward the goals of that act: to "protect the public and . . . encourage the development of the atomic energy industry." 42 U.S.C. § 2012.[5]

In addition to Congress' manifest intent to create a new and entirely federal cause of action, there are sufficient other federal elements in this cause of action to support "arising under" jurisdiction. Before determining whether it has jurisdiction, the district court must decide, in the first instance, whether the alleged injuries arise out of a nuclear incident. This prerequisite parallels the determination that a court must make when faced with a cause of action under the Foreign Sovereign Immunities Act, a determination that, according to the *Verlinden* Court, satisfies the requirements of Article III. Additionally, if the public liability action results from an ENO, the district court then will have to apply the federal statute of limitations contained in the Amendments Act. It will also have to enforce the provisions of the Amendments Act which require the defendants to waive their state common law defenses. Finally, the court will have to assess whether the applicable state law is consistent

---

5. In choosing to adopt state law as the basis for the federal cause of action, Congress compared this to other acts based on state law. Specifically, the House Committee on Interior and Insular Affairs reported:

> Rather than designing a new body of substantive law to govern such cases, however, the bill provides that the substantive rules for decision in such actions shall be derived from the law of the state in which the nuclear incident involved occurs, unless such law is inconsistent with the Price–Anderson Act. The Committee believes that conferring on the Federal courts jurisdiction over claims arising out of all nuclear incidents in this manner is within the constitutional authority of Congress and notes that the Congress has used this approach in the Outer Continental Shelf Lands Act.

H.R.Rep. No. 104, pt. 1 at 18.

Mr. O'Conner seeks to distinguish the use of state law in the OCSLA from the use of state law in the Amendments Act. Primarily, Mr. O'Conner asserts that OCSLA is distinguishable because Congress was legislating over federal territory. Like the district court, we "believe[ ] that Congress has jurisdiction over interstate commerce [ (the Amendments Act's basis for jurisdiction) ] just as it has jurisdiction over federal territory. Congress would have the same power to federalize state causes of action asserting either basis for jurisdiction." *O'Conner v. Commonwealth Edison Co.*, 770 F.Supp. 448, 453 (C.D.Ill.1991).

with federal law. As the Third Circuit noted in *TMI*, the Amendments Act places great weight on the necessity of the district court's determining whether state and federal law are consistent. Because the Supreme Court had made clear that federal law completely occupies the field of nuclear safety, and consequently preempts state action in this area, the *TMI* court believed that the duty a defendant owes to a plaintiff in a public liability action similarly is dictated by federal law. *TMI*, 940 F.2d at 858. Thus, any public liability action has significant federal ingredients which satisfy arising under jurisdiction.[6]

All of these federal "ingredients," *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 823, 6 L.Ed. 204 (1824), create a cause of action "arising under" federal law.[7] The presence of these federal ingredients in the Amendments Act is particularly convincing when their significance is assessed not in a vacuum but in relation to the entire federal regulatory scheme which we have described earlier. As the Third Circuit noted in *TMI*:

> The Amendments Act creates a federal cause of action which did not exist prior to the Act, establishes federal jurisdiction for that cause of action, and channels all legal liability to the federal courts through that cause of action. By creating this federal program which requires the application of federal law, Congress sought to effect uniformity, equity, and efficiency in the disposition of public liability claims. With the federal jurisdiction and removal provisions set forth

in the Amendments Act, Congress ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided for the coordination of all phases of litigation and the orderly distribution of funds, and assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident.... Thus, Congress clearly intended to supplant all possible state causes of action when the factual prerequisite [sic] of the statute are met....

> Through the Amendments Act, Congress has placed an overlay of federal law upon the rights and remedies previously available under state law. Once a federal court is satisfied that a particular suit is a public liability action, additional questions under the Amendments Act may need to be addressed. Under certain circumstances licensees may be required to waive defenses which would have been viable under state law. Punitive damage awards available under state law also may be precluded. Furthermore, in every case alleging public liability, courts will be required to determine whether state law principles conflict with other parts of the Price–Anderson scheme.

940 F.2d at 856–58. Consequently, the Amendments Act does not violate Article III.

## B. *Retroactivity*

Mr. O'Conner next challenges the retroac-

---

6. We address this particular issue of duty of care for a public liability cause of action in greater detail later in the opinion. *See infra* part II.C.

7. In supporting his position of unconstitutionality, Mr. O'Conner invites our attention to a number of pre-Amendments Act cases. *See, e.g., Stibitz v. General Pub. Util. Corp.*, 746 F.2d 993, 997 (3d Cir.) (holding that public liability action did not "arise under" pre–1988 Price–Anderson Act for Article III purposes and therefore federal court did not have subject matter jurisdiction over cause of action), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1984); *Kiick v. Metropolitan Edison Co.*, 784 F.2d 490, 495 (3d Cir.1986) (same). We do not think this assertion merits discussion at length. As demonstrated above, the Amendments Act greatly expanded the coverage of the Price–Anderson Act. Furthermore, the Amendments Act specifically created a cause of action and designated the substantive provisions, venue, choice of law, etc. *See supra*

part II.A.1. Indeed, the Third Circuit explicitly stated that its pre-Amendments Act cases provided no support for an Article III challenge to the Amendments Act. That court explained:

> With the Amendments Act, however, the entire Price–Anderson landscape was transformed. Congress clearly considered the decisions of our court holding that Congress had not intended to create a federal cause of action for cases not based upon an extraordinary nuclear occurrence.... Congress then provided, in the Amendments Act, the clearest expression of intent that there be a federal cause of action arising directly under the Act. Despite the plaintiffs' arguments to the contrary, *Kiick*, *Stibitz*, and the other pre-Amendments Act cases provide no support for the Article III challenge made here.

*TMI*, 940 F.2d at 857.

tivity provisions of the statute.[8] He argues that retroactive application of the statute violates due process because there is no "legitimate legislative purpose ... presented by the Act." Appellant's Br. at 20. He claims that the statute was designed only for the benefit of those in the Three Mile Island ("TMI") litigation, and that therefore it is wholly irrational that he falls within the reaches of the Act.

■ We disagree with Mr. O'Conner's characterization of the statute's purpose and therefore with his conclusion as to its constitutionality. First, we note that Mr. O'Conner must overcome a strong presumption that the retroactive application of the statute is constitutional. "Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984). Because we do not believe that Congress, in making the statute retroactive, " 'has acted in an arbitrary and irrational way,' " *id.* at 731, 104 S.Ct. at 2718, we uphold it against the plaintiff's constitutional challenge.

■ In enacting the removal provision, Congress recognized that the same problems that could arise in litigating an ENO could also occur in litigating a non-ENO nuclear incident.

> The experience with claims following the TMI accident demonstrates the advantages of the ability to consolidate claims after the nuclear incident.... The availability of the provisions for consolidation of claims in the event of any nuclear incident, not just an ENO, would avoid the inefficiencies resulting from duplicative determinations of similar issues in multiple jurisdictions that may occur in the absence of consolidation.

S.Rep. No. 218 at 13. According to the legislative history, there are at least two reasons for the removal provisions which pertain to retroactive as well as prospective application of the Amendments Act. First, the removal provisions "ensure the equitable and uniform treatment of victims." H.R.Rep. No. 104, pt. 3, at 30. In addition, removal assures "the avoidance of similar issues in multiple jurisdictions that may occur in the absence of consolidation." S.Rep. No. 218 at 13. "Retroactivity guarantee[s] that all cases arising out of the same nuclear incident could be consolidated in one forum," *TMI*, 940 F.2d at 861, and thus accomplishes the purposes as set forth by the congressional committees.[9] Consequently, Mr. O'Conner has not overcome the presumption in favor of the Amendments Act's constitutionality.[10]

---

**8.** Section 20(b)(1) of the Amendments Act, Pub.L. No. 100–408, makes clear that the jurisdictional and standard of care provisions at issue here are applicable to all nuclear incidents occurring before, on, or after the effective date of the statute.

**9.** Mr. O'Conner submits that, even if there is a general federal purpose accomplished by the retroactive application of the removal provisions, such as the TMI litigation, there is no federal purpose accomplished by including his case in the class of cases that can be removed, retroactively or prospectively. In fact, Mr. O'Conner's counsel suggested at oral argument that the purposes of the Price–Anderson Act would not be accomplished unless claims from an incident totalled at least $60 million, the trigger point of indemnification. However, Mr. O'Conner presents no authority that would render a statute violative of due process because it includes within its ambit cases whose adjudicative facts directly implicate identifiable interests and those whose facts do not impact as severely on the federal interest. Furthermore, although the pipe-flushing incident at Commonwealth Edison

apparently did not present such a situation, it is conceivable that such an incident would spawn litigation by various individuals in various courts. In such a situation, consolidation and removal would accomplish the purposes of the Amendments Act as set forth by the committees, even if the claims did not total $60 million.

**10.** Mr. O'Conner also maintains that the retroactivity provisions of the statute violate state sovereignty. Mr. O'Conner provides this court with scant authority for this proposition. Furthermore, it is clear that removal provisions generally do not encroach unconstitutionally upon state sovereignty. See *Tennessee v. Davis*, 100 U.S. 257, 267, 25 L.Ed. 648 (1880), stating:

> The removal of cases arising under [the laws of the United States] from State into Federal courts is, therefore, no invasion of State domain. On the contrary, a denial of the right of the general government to remove them, to take charge of and try any case arising under the Constitution or laws of the United States, is a denial of the conceded sovereignty of that

## C. Standard of Care

Mr. O'Conner next argues that the district court erred in determining that Illinois would apply the federal regulations as an absolute standard of care for negligence. He claims that under Illinois law "it is axiomatic that regulation and standards of an administrative body are evidence of, but not conclusive of, the standard of care." Appellant's Br. at 32. Consequently, the federal safety standards should have constituted only evidence of due care.

We begin our analysis with the statutory directive in the Price–Anderson Amendments Act. According to the statute, "the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." 42 U.S.C. § 2014(hh). Thus, we first look to Illinois law to determine the standard of care applicable to this cause of action.

### 1.

Illinois courts have spoken on several occasions regarding how regulations should be used in negligence cases. The principal Illinois case articulating this use is *Darling v. Charleston Hospital*, 33 Ill.2d 326, 211 N.E.2d 253 (Ill.1965), *cert. denied*, 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966). In *Darling*, the trial court had allowed the plaintiff to introduce hospital regulations, standards, and by-laws as evidence of the defendant hospital's negligence. The Illinois Supreme Court held that, in the case before it, standards played the same role as custom.

> "By the great weight of modern American authority a custom either to take or to omit a precaution is generally admissible as bearing on what is proper conduct under the circumstances, but is not conclusive." Custom is relevant in determining the standard of care because it illustrates what is feasible, it suggests a body of knowledge of which the defendant should be aware, and it warns of the possibility of far-reaching consequences if a higher standard is required. But custom should never be conclusive.

*Darling*, 211 N.E.2d at 257 (citations omitted).

The plaintiff argues that *Darling* mandates that regulations be used only as evidence of the standard of care and not the standard itself. Like the district court, however, we believe that, in the case at hand, Illinois law does not mandate such a wooden application of *Darling*. Unlike the safety regulations at issue in *Darling*, safety standards for nuclear power plants do not equate easily to custom. As the district court stated, "[c]ustom is a flexible guide for situations in which there is a margin of error." *O'Conner v. Commonwealth Edison Co.*, 748 F.Supp. 672, 676 (C.D.Ill.1990). The regulations for nuclear power plants, however, are not flexible guides; there is no "margin of error." The regulations require strict adherence so that workers and the public are protected, and so that public utilities are not exposed to liability when workers receive noninjurious doses of radiation. Strict adherence to federal safety standards in the field of nuclear energy, unlike in other industrial or quasi-industrial settings, is a necessity. Consequently, the approach of *Darling* is not appropriate when matters of safety in the nuclear power industry are at stake.[11]

---

government over a subject expressly committed to it.

**11.** Other cases suggest that Illinois law affords the federal safety regulations a more vital role in determining the standard of care than that given the regulations in *Darling*. As the district court noted, "Illinois courts have explicitly used the Restatement (2d) of Torts, § 286 to determine the proper duty where there is a regulation or other law relevant to the applicable standard of care." *O'Conner*, 748 F.Supp. at 677; *see also Davis v. Marathon Oil Co.*, 64 Ill.2d 380, 1 Ill. Dec. 93, 97, 356 N.E.2d 93, 97 (1976). Section 286 of the Restatement (2d) of Torts provides:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or administrative regulation whose purpose is found to be exclusively or in part (a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect a particular interest which is invaded, and (c) to protect that interest against the kind of harm that has resulted, and (d) to protect that interest against the particular hazard from which the harm results. As the district court determined, all of these factors apply to the situation at hand: (a) the purpose of the federal regulations is to protect

We find instructive the Illinois Supreme Court's decision in *Rucker v. Norfolk & Western Railway Co.*, 77 Ill.2d 434, 33 Ill. Dec. 145, 396 N.E.2d 534 (1979). In that case, the court addressed the role of federal regulations that specified the safety features of railroad cars in determining the standard of care. The defendants argued that the "promulgation of Federal regulations on the subject of railroad cars indicates the intention of Federal authorities that no liability should attach to manufacturers whose products are in compliance with those regulations." *Rucker*, 33 Ill.Dec. at 148, 396 N.E.2d at 537. The Illinois Supreme Court disagreed. It stated:

> Contrary to GATX' contention, we do not believe that the presence of Federal regulations on the subject precludes the imposition of tort liability according to State tort law standards more stringent than those contained in the Federal regulations. *We find no indication in the Federal regulations that the preemption of State tort law was intended.* In fact, it would be reasonable to conclude that the purpose of the regulations is to insure greater safety and that the imposition of tort liability on the basis of more stringent State tort law was intended.

*Id.* (emphasis added).

We believe that the differences between *Rucker* and the present case also counsel application of the federal safety standards as the standard of negligence in this case. In *Rucker*, there was no evidence of preemption and therefore the court did not use the federal regulations as the measure of duty. By implication, when there is evidence of federal preemption, the court would use the federal regulations as the measure of duty.[12] In the field of nuclear safety, there is not only evidence of preemption, but also uncontradicted statements by the Supreme Court that federal nuclear safety regulations preempt all state safety regulations. For instance, in *Pacific Gas & Electric Co. v. State Energy Conservation & Development Commission*, 461 U.S. 190, 208, 103 S.Ct. 1713, 1724, 75 L.Ed.2d 752 (1983), the Court concluded that "the safety of nuclear technology was the exclusive business of the Federal Government." Similarly, in *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 240–41, 104 S.Ct. 615, 617, 78 L.Ed.2d 443 (1984), the Court reiterated that "states are precluded from regulating the safety aspect of nuclear energy." In *Silkwood*, the Court distinguished state standards for nuclear safety from state tort remedies:

> Congress' decision to prohibit the States from regulating the safety aspects of nuclear development was premised on its belief that the Commission was more qualified to determine what type of safety standards should be enacted in this complex area. As Congress was informed by the AEC, the 1959 legislation provided for continued *federal control over the more hazardous materials because "the technical safety considerations are of such complexity that it is not likely that any State would be prepared to deal with them during the foreseeable future."* H.R.Rep. No. 1125, 86th Cong., 1st Sess., 3 (1959). If there were nothing more, this concern over the States' inability to formulate effective standards and the foreclosure of the States from conditioning the operation of nuclear plants on compliance with state-imposed safety standards arguably would disallow resort to state-law remedies by those suffering injuries from radiation in a nuclear plant. There is, however, ample evidence that Congress had no intention of forbidding the States to provide such remedies.

---

the worker, *see* 10 C.F.R. § 20.101; (b) the interest to be protected is the interest in not being overexposed to radiation; (c) the regulation also is designed to protect against bodily harm caused by overexposure; and (d) the regulations were enacted to protect the interest in bodily safety against the hazard of overexposure to radiation. Thus, we believe the Restatement, on which Illinois courts have relied explicitly, counsels application of the federal standard in this situation.

**12.** *Cf. Hunt v. Blasius*, 55 Ill.App.3d 14, 12 Ill. Dec. 813, 8, 370 N.E.2d 617, 620 (Ill.App.1977) ("If applicable governmental standards and specifications are mandatory requirements for sale of a product to that governmental entity and from which a manufacturer cannot deviate, is liability precluded in any respect in which the product complies? We answer in the affirmative."), *aff'd*, 74 Ill.2d 203, 23 Ill.Dec. 574, 384 N.E.2d 368 (1978).

*Id.* at 250–51, 104 S.Ct. at 622–23 (emphasis added). Noting this difference, the Supreme Court allowed an award of punitive damages under state tort law.[13] Thus, we agree with the Third Circuit in *TMI* that it is clear from *Pacific Gas & Electric* and from *Silkwood* that state regulation of nuclear safety, through either legislation or negligence actions, is preempted by federal law. *See TMI,* 940 F.2d at 858 ("Two Supreme Court cases indicate that the duty the defendants owe the plaintiffs in tort is dictated by federal law."). When there is such overwhelming evidence of preemption with respect to safety matters, we believe *Rucker* requires use of the federal standard as the standard of care in state tort actions. Accordingly, we conclude that Illinois would use the federal safety regulations as the applicable standard of care in public liability actions.

### 2.

 Even if Illinois would not apply the federal safety standards as the standard of care, however, we believe that the federal regulations must provide the sole measure of the defendants' duty in a public liability cause of action. Two reasons support this conclusion. First, the pre-Amendments Act preemption of state safety standards prevents application of a state standard of care at odds with federal safety standards. As we have already noted, the field of nuclear safety has been occupied by federal regulation; there is no room for state law. Consequently, "states are preempted from imposing a non-federal duty in tort, because any state duty would infringe upon pervasive federal safety regulations in the field of nuclear safety, and thus would conflict with federal law." *TMI,* 940 F.2d at 859.

In addition, as we noted at the outset of this discussion, the Amendments Act provides that state law shall be applied only as long as it is ʻconsistent with the Price Anderson Act. 42 U.S.C. § 2014(hh). As discussed in Part II.A.1 of this opinion, Congress has attempted for nearly fifty years to encourage private sector involvement in the nuclear industry and at the same time has sought to protect the public. The Price–Anderson Act was enacted to promote these goals of "protect[ing] the public and . . . encourag[ing] the development of the atomic energy industry." 42 U.S.C. § 2012. Accordingly, the Price–Anderson Act limits liability and provides for indemnification, but does so against a stringent regulatory background. The federal nuclear safety regulations are part of this statutory scheme. Imposing a standard of care other than the federal regulations would disturb the carefully crafted balance between private involvement and safety that Congress has achieved. Thus, the application of something other than the federal safety regulations as a standard of care is inconsistent with the Price–Anderson scheme and consequently cannot be applied in a public liability action.

### D. *Evidentiary Issues*

 Lastly, Mr. O'Conner argues that the district court erred when it ruled Dr. Scheribel's testimony inadmissible. Mr. O'Conner asserts that Dr. Scheribel's testimony was held inadmissible only because he is a "lone voice." Mr. O'Conner believes that Dr. Scheribel's method of observation and diagnosis is sound and therefore that the jury should be allowed to hear and weigh the testimony itself.[14]

---

**13.** *Silkwood*'s holding regarding damages was overruled by the Amendments Act which specifically bars punitive damages. *See* 42 U.S.C. § 2210(s) ("No court may award punitive damages in any action with respect to a nuclear incident or precautionary evacuation against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident or evacuation."). Moreover, the Amendments Act makes pointedly clear that any tension between federal standards and state liability standards is to be resolved so as to avoid inconsistency with the Price–Anderson Act. *See* 42 U.S.C. § 2014(hh).

**14.** Mr. O'Conner also seems to argue that, because Dr. Scheribel is a treating physician, he is exempt from the requirements of Federal Rules of Evidence 702 and 703. However, we do not distinguish the treating physician from other experts when the treating physician is offering expert testimony regarding causation. *See Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 613 (7th Cir. 1993). Mr. O'Conner has not cited us any authority to the contrary.

Our discussion of the admissibility of Dr. Scheribel's testimony is guided by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court rejected the test first enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), as the standard for admissibility of scientific evidence.[15] Instead, the Court adopted a standard based on the Federal Rules of Evidence. The Court "began its analysis by focusing on the language of Rule 702. It found the rule clearly anticipated 'some degree of regulation of the subjects and theories about which an expert may testify.' " *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 (7th Cir.1993) (quoting *Daubert*, —— U.S. at ——, 113 S.Ct. at 2795).[16] The Court stated in *Daubert*:

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas from such facts or accepted as truths on good grounds."

*Daubert*, —— U.S. at ——, 113 S.Ct. at 2795 (citations omitted). The Court continued:

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.*, "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Id.*

We have interpreted *Daubert* to require that the district court undertake a two-step inquiry. *Daubert* first "directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.' " *Porter*, 9 F.3d at 613 (quoting *Daubert*, —— U.S. at ——, 113 S.Ct. at 2795). Second, the district court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying." *Id.* at 616.[17] We do not believe that Dr. Scheribel's testimony can meet at least the first requirement. Dr. Scheribel testified:

> I know what cataracts look like when they've been induced by radiation, by whatever dosage or time of exposure there was. Radiation cataracts are clinically describable and definable condition which, when present, cannot be mistaken for anything else.

Scheribel Dep. at 69. Essentially, Dr. Scheribel's method is to observe the cataracts and determine if they have characteristics specific to radiation-induced cataracts. Dr. Scheribel cites several sources that allegedly support this methodology. However, none of these sources indicates that radiation-induced cataracts can be identified by mere observation. Indeed, the articles referenced by Dr. Scheribel establish that Dr. Scheribel's methodology has no basis in scientific fact. These articles state that, although radiation-induced cataracts are of the posterior subcapsular type, all posterior subcapsular cataracts are not radiation-induced.[18] Fur-

---

**15.** Prior to *Daubert*, the majority of federal courts applied the *Frye* standard to determine the admissibility of scientific evidence. The *Frye* test held "inadmissible expert testimony based on a scientific technique unless that technique is generally accepted as reliable in the relevant scientific community." *Porter*, 9 F.3d at 612 n. 3.

**16.** Federal Rule of Evidence 702 provides:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or edu-

cation, may testify thereto in the form of an opinion or otherwise.

**17.** *Daubert* and the Federal Rules require that scientific evidence meet both requirements before it is admissible.

**18.** Although the specific pages of the articles that refute Dr. Scheribel's testimony are not included in the record, the plaintiff does not dispute the district court's conclusions regarding the contents of these articles.

thermore, Dr. David J. Apple, author of one of the sources cited by Dr. Scheribel, affirmed that Dr. Scheribel's conclusion was incorrect: "Radiation induced cataracts are characteristically posterior subcapsular cataracts, but are not pathognomic [sic] as Dr. Scheribel represents." Apple Aff. at 2. Dr. Apple then describes the methodology necessary to determine if cataracts are radiation-induced:

> The proper methodology, upon which any reasonable expert would rely, would include an examination of the medical literature on radiation-induced cataracts, an examination of the occupational dosimetry records which existed for the patient, a medical work-up to look for any of the normal biological changes which occur in individuals exposed to high levels of radiation, and a work-up of the patient's history to look for any other causes of the observed cataracts.

*Id.* However, Dr. Scheribel took none of these steps to determine the cause of Mr. O'Conner's cataracts. His method of diagnosis and his conclusion regarding causation therefore are not supported by the authors on which he claims to rely.

Beyond the recitation of authorities which clearly do not support his opinion, Dr. Scheribel has not come forward with any other support for his causation opinion. He has not produced any personal study or experiments that otherwise would justify his conclusions that Mr. O'Conner's cataracts are radiation-induced. Indeed, his familiarity with the effects of radiation generally is limited.[19] Dr. Scheribel's opinion has no scientific basis and, consequently, the district court correctly ruled that Dr. Scheribel's testimony is inadmissible.[20]

Because Dr. Scheribel provided the only evidence that Mr. O'Conner was subjected to radiation in excess of federal safety standards, Mr. O'Conner cannot prove causation. Accordingly, the district court was correct in granting summary judgment.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

**19.** During his deposition, Dr. Scheribel testified that he based his opinion on his prior experience with radiation-induced cataracts. However, Dr. Scheribel has treated only five patients with radiation-induced cataracts in his twenty years of practice. We do not believe that this limited exposure to radiation-induced cataracts qualifies as a basis for a scientifically sound opinion. *Accord Porter,* 9 F.3d at 614 n. 6 (stating that seeing disease five times during lengthy career not sufficient basis for scientific opinion under *Daubert* ). Furthermore, Dr. Scheribel seemed to abandon this as a basis for his opinion in his affidavit which made no mention of personal experience.

**20.** Because we conclude that Dr. Scheribel's methodology is not well grounded in the scientific method, we have no occasion to consider whether there is the proper fit between the methodology used and the facts presented.