Kristofer SORENSEN, a Minor, By and Through his Parent and Next Friend, Laura E. DUNBAR; Katrina Sorensen, a Minor, by and through her Parent and Next Friend Laura E. Dunbar, Appellants,

v.

SHAKLEE CORPORATION, also known as Shaklee Products, Inc.; Union Carbide Chemicals & Plastics Company, formerly known as Union Carbide Company, Inc., Appellees.

No. 93–3454.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1994.

Decided Aug. 2, 1994.

Before BOWMAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and LOKEN, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Kristofer and Katrina Sorensen have suffered from mental retardation since birth, allegedly caused by their parents' ingestion, prior to the children's conception, of alfalfa health food tablets produced and distributed as a Shaklee product by defendant Shaklee Corporation (Shaklee). Some of these alfalfa tablets had been treated with the chemical ethylene oxide (EtO), leaving on some a chemical residue of ethylene chlorohydrin (ETCH) and ethyl glycol. Defendant Union Carbide Chemicals & Plastics Company, Inc. (Union Carbide) produced EtO.

Kristofer and Katrina, through their mother, Laura E. Dunbar, claimed their birth defects had been caused by the chemical treatment residue on the alfalfa tablets ingested by the parents, Laura and her former husband Nord Sorensen. After reviewing discovery materials including disputed and contradictory medical and scientific evidence presented by the parties, the district court granted defendants' motions for summary judgment for failure of proof of causation. Plaintiffs Kristofer and Katrina appeal.

The principal question presented by this appeal is whether, in light of the Supreme Court's 1993 opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), plaintiffs presented relevant admissible evidence to establish a jury question on causation. We agree with the district court [1] and affirm.

James R. Welsh, Omaha, NE, argued, for appellants.

Dennis M. Gray, Council Bluffs, IA, argued, for appellee Shaklee.

Rex A. Rezac, Omaha, NE, argued (Scott J. Rogers, John E. Carne, Ezra Hendon, Adrienne Larkin, Joseph K. Meusey, Marjorie L. Fine, and Robert F. Rossiter, Jr., on the brief), for appellee Union Carbide.

## I. BACKGROUND

### A. Factual History

Alfalfa tablets are among the products distributed by defendant Shaklee. In 1974, Shaklee's in-house microbiological staff isolated a batch of alfalfa tablets that showed traces of salmonella. Shaklee sent those tablets to Griffith Laboratories U.S.A., Inc. (Griffith) for purification.[2] Griffith sterilized

---

1. The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

2. The parties dispute the number of tablets involved: Shaklee contends the number included

the tablets with EtO manufactured by Union Carbide. Since the 1930s, EtO has been used as an antimicrobial agent in the sterilization of medical instruments, pharmaceutical products, spices, tobacco and other botanical products.[3]

An outside laboratory subsequently tested the tablets for EtO residue and found traces of ETCH at a maximum level of 3000 parts per million (ppm).[4] The testing revealed no traces of EtO. Shaklee's records fail to reveal the disposition of the 1974 fumigated tablets—whether the entire batch was destroyed, whether the tablets were both partially destroyed and partially distributed or whether the batch was distributed in toto. Shaklee asserts that if these finished alfalfa tablets were sold, they would have been consumed by April 1975, well before the conception of either plaintiff.

Following discovery of the bacteria-contaminated tablets, Shaklee issued a specification in 1975 to its alfalfa supplier, Cal–Leaf Health Products, Inc. (Cal–Leaf), requiring a zero tolerance level for salmonella and E. coli microorganisms. To meet this requirement, Cal–Leaf sent its raw alfalfa powder to Griffith for EtO sterilization. Based upon independent testing, no EtO residues were detected during 1975 and 1976. In 1977, however, testing by the WARF Institute, Inc.

(WARF) indicated the presence of ETCH ranging from 20–24 ppm in the alfalfa tablets and 153–459 ppm in the alfalfa powder. In its reports to Shaklee following recitation of the test results, WARF made the following recommendations:

> Ethylene Chlorohydrin is a known mutagen and teratogen, and has recently appeared on the suspect carcinogen list....
>
> The levels found in the ingredients tested are not of great concern from the acute toxicological standpoint but certainly of concern in a chronic situation. Our generation may never be affected by these levels as there is no human evidence to support the data. Future generations could quite probably be affected with long term use by our generation.
>
> According to the Code of Federal Regulations, there are no tolerances for Ethylene Oxide in anything but walnut meats, spices and copra. The ingredients we tested are unlikely to fall into any of the above categories. It therefore may be wise according to Warf's expert judgment to consider a possible recall of all products containing ingredients which have been fumigated with Ethylene Oxide.

App. at 1335 (September 20, 1977 report).

A toxicological panel evaluated the data produced and concluded that ETO fumiga-

---

23 million, whereas plaintiffs rely upon an internal Shaklee memorandum drafted three years following the tablet sterilization, placing the amount at 62 million. For purposes of resolving the issues on appeal, the number of contaminated tablets is not of any controlling weight.

3. The use of EtO on food products is subject to federal regulation. For example, 40 C.F.R. § 185.2850 (1993) (formerly 21 C.F.R. § 193.200 (1986)), provides in part:

> Ethylene oxide may be safely used as a fumigant for the control of micro-organisms and insect infestation in ground spices and other processed natural seasoning materials, except mixtures to which salt has been added, in accordance with the following prescribed conditions:
>
> ....
>
> (c) Residues of ethylene oxide in ground spices from both postharvest application to the raw agricultural commodity whole spices and application to the ground spices shall not exceed the established tolerance of 50 parts per million for residues in whole spices in 40 CFR 180.151.

Federal regulations recognize ethylene oxide to be a hazardous substance. See, e.g., 24 C.F.R. Pt. 51, Subpart C (1990); 29 C.F.R. § 1910.119, App. A (1992). Based upon our resolution of the issues presented in this appeal, we need not determine whether the alfalfa tablets constituted a "ground spice."

4. The parties, and consequently the district court, abbreviated ethylene chlorohydrin as ECH. See Sorensen v. Shaklee Corp., No. 1–91–CV–70007, slip op. at 4 (S.D.Iowa Sept. 28, 1993). ECH, however, symbolizes a different chemical compound, epichlorohydrin, see App. at 846, which is a reactive molecule, classified as an epoxide and derived by removing hydrogen chloride from dichlorohydrin. Gessner G. Hawley, The Condensed Chemical Dictionary, 10th ed. (1981), at 413. Ethylene chlorohydrin or ETCH, on the other hand, is derived from the action of hypochlorous acid on ethylene. Id. at 430. Both substances are considered toxic by ingestion, inhalation and skin absorption. Id. at 413, 430. Notwithstanding the confusion resulting from interchanging ECH for ETCH, the matter does not bear upon our resolution of the issues on appeal.

tion of food products should be halted immediately based on the levels of residue found in the products.

*Id.* at 1369 (October 14, 1977 report).

In an internal memorandum dated September 27, 1977, having previously consulted with in-house legal counsel, Shaklee disputed WARF's characterization of the alfalfa as falling outside the ambit of the Code of Federal Regulations' "spice" category. *Id.* at 1320. Notwithstanding this dispute, Shaklee decided to destroy its on-hand supply of alfalfa tablets and powder treated with EtO. Further, during the summer of 1977, Shaklee began developing a non-chemical, heat sterilization process. From August 1977 to February 1978, Shaklee did not distribute any alfalfa tablets.

Shaklee employees conducted an analysis of the company's use of EtO, culminating in a memorandum dated October 6, 1977, comprised of notes from interviews of various Shaklee employees conducted on October 4. Some of the employees recalled that at least one Shaklee official, including George Lieberman, Vice President of Operations and in charge of Research & Development, was unconcerned with checking for residuals from the EtO fumigating and did not want to know how Cal–Leaf eradicated the bacteria. *Id.* at 1344–45, 1349–50.

Nord Sorensen and Laura Dunbar began using Shaklee products, including alfalfa tablets, in late 1975 or early 1976, after Nord's mother (Janet) told them about the products and averred to their considerable health benefits. Nord and Laura obtained Shaklee products from a local distributor in Iowa, as well as Janet's remaining supply in June or July of 1977 (purchased sometime prior to her death in September 1976). Nord estimated that the supply obtained from his mother lasted until June of 1978.

From the summer of 1977 through the birth of Kristofer on June 17, 1978, Laura took an average of two to four alfalfa tablets a day; Nord took about six to eight tablets a day. During that same period, Laura also smoked approximately a half a pack or less of cigarettes a day and drank only one alcoholic beverage. Thereafter, prior to learning she was again pregnant, Laura took about one to two alfalfa tablets per day. From the end of 1978 through the birth of Katrina on December 14, 1979, Laura took approximately two to four alfalfa tablets a day. The record does not indicate Nord's daily use of the tablets between the time of Kristofer's birth and Katrina's conception. Laura smoked almost a pack of cigarettes a day during her pregnancy with Katrina. Both Kristofer and Katrina were born severely mentally retarded, and have similar physical attributes. Laura and Nord discontinued the alfalfa tablets sometime after Katrina's birth. A third child fathered by Nord was unaffected by any genetic or developmental disability. Subsequently, Nord and Laura divorced, Laura remarried and she and Gary Dunbar had a healthy child in January 1987.

Laura provided the following family medical history. She had an uncle who was "probably mildly retarded," *id.* at 751, a second cousin who had cerebral palsy, a nephew with emotional reaction-induced epileptic seizures, a brother who died shortly after birth who had hydrocephaly, and a fifth cousin with meningitis. The record does not indicate the presence of genetic or developmental disabilities in Nord's family.

## B. Procedural History

Plaintiffs, Kristofer and Katrina Sorensen, initially brought suit by and through their parents and next friends, Nord Sorensen and Laura Dunbar, against Shaklee, Union Carbide, Cal–Leaf, Griffith, and several individual defendants in Iowa state court. Prior to the state court's resolution of Shaklee's motion for summary judgment, plaintiffs dismissed their action, *see Sorensen v. Shaklee Corp.,* 461 N.W.2d 324 (Iowa 1990) (upholding plaintiffs' dismissal of their state action prior to the resolution of defendant's summary judgment motion), and refiled their claims in federal district court.[5]

---

5. The style of plaintiffs' federal complaint, unlike the state case, does not include Nord Sorensen as parent and next friend. *Sorensen v. Shaklee*

*Corp.,* No. 1–91–CV–70007 (S.D.Iowa Sept. 28, 1993).

Plaintiffs' federal action, based upon diversity of citizenship, claimed, inter alia, misrepresentation, negligence, strict liability, breach of warranty, fraud and res ipsa loquitur against Shaklee, and negligence, strict liability and res ipsa loquitur against Union Carbide. Subsequently, all of the defendants but Shaklee and Union Carbide either settled or were otherwise dismissed from the case. The district court thereafter granted defendants' motions for summary judgment. *Sorensen v. Shaklee Corp.*, No. 1–91–CV–70007 (S.D.Iowa Sept. 28, 1993).

## C. Evidence Presented

### (1) Plaintiffs' experts

The following general observations derive from our review of the record pertaining to the testimony of plaintiffs' experts. As amply stated by the district court:

No published scientific literature reports mental retardation in any species at any dose level resulting from exposure to ETO or ECH.[6] No expert designated to testify on plaintiffs' behalf in this action has submitted his or her conclusions for peer review that ETO and/or ECH can cause birth defects. There is no evidence of a statistically significant association between the ingestion of ETO-sterilized alfalfa tablets and mental retardation. No expert designated to testify on plaintiffs' behalf in this action can identify either the number of mutagenic agents or the amount of such agents to which plaintiffs' parents were exposed prior to plaintiffs' births. Each expert designated to testify on plaintiffs' behalf in this case has assumed that plaintiffs' parents were not exposed to any substances, other than ETO and/or ECH, which have the ability to produce either teratogenic or mutagenic effects. The theories of causation which will be advanced by the expert witnesses designated to testify on plaintiffs' behalf in this case cannot distinguish the effects of ETO or ECH from other mutagenic or teratogenic substances to which plaintiffs' parents may have been exposed....

Dist.Ct.Op. at 4.

Plaintiffs' most supportive expert was Henry T. Lynch, M.D., a professor of medicine and chair of the Department of Preventative Medicine/Public Health at Creighton University School of Medicine. Dr. Lynch considers himself to be an expert in "medical genetics, internal medicine and medical oncology." App. at 1043. A review of Dr. Lynch's curriculum vitae indicates that he has written extensively on genetics and cancer. *Id.* at 1254–96.

In his affidavit dated March 27, 1989, Dr. Lynch opined,

to a reasonable degree of scientific certainty, that these two mentally retarded children were the products of parents who had consumed alfalfa tablets produced by Shaklee and fumigated with ETO.... that ethylene oxide and/or its degradation [sic] product, ethylene chlorohydrin, is etiologic in these children and is therefore the proximate cause of their disorder....

*Id.* at 1247. Dr. Lynch identified two specific mechanisms emanating from the exposure to EtO or ETCH as "highly probable" as the cause of the Sorensen children's mental retardation:

That a germ line mutation occurred and this involved a section of the gonad (testicle or ovary) of the father or mother, respectively, through a genetic phenomenon known as gonadal mosaicism....

The second possibility is that of a multifactorial induced phenomenon emminating [sic] from the ethylene oxide/ethylene chlorohydrin exposure, in this case, through the mother, Laura Dunbar via a transplancental [sic] mechanism....

*Id.* at 1248. Further, Dr. Lynch did not believe it necessary, "in order to render an opinion within a reasonable degree of scientific certainty, on the etiology of a given disorder to understand the mechanism." *Id.* at 1249.

Dr. Lynch expressed similar opinions in his January 13, 1989 deposition. In addition, he stated that the amount consumed was not critical to his opinion and that, with genotype susceptibility, a small amount could cause

6. As previously explained, *ante* n. 4, the district court referred to ethylene chlorohydrin as ECH.

either teratogenic or mutagenic effects.[7] *Id.* at 264, 1056–57, 1063. Dr. Lynch's opinion was that EtO and/or ETCH may have acted either as a direct mutagenic agent in the germ line cells of Nord Sorensen or Laura Dunbar and/or as a teratogenic agent through Laura's consumption of these chemicals during the course of her pregnancies. *Id.* at 1247–49.

At both his July 6, 1992 and December 16, 1992 depositions, however, Dr. Lynch was unable to testify with the same degree of certainty. Instead, he agreed that given the absence of research into the effects of ingested EtO and ETCH, the most he could testify to was that EtO or a by-product thereof could possibly have caused the mental retardation of the children by virtue of the susceptibility of the fetal tissue. *Id.* at 1220–21. He also conceded that Nord and Laura were probably exposed to other sources of EtO and/or ETCH during the relevant time period, *id.* at 1233, and that with two sources of EtO-exposed material, there is no way of differentiating which molecule caused the effect, *id.* at 1169. Finally, Dr. Lynch could not identify any "statistically significant epidemiological proof that ethylene oxide or ethylene chlorohydrin causes mental retardation," *id.* at 292, and he was unaware of "any studies that have shown mutagenesis from exposure to ethylene oxide or ethylene chlorohydrin in humans at a dose lower than her [Laura Dunbar's] predicted [mutagenic] dose," *id.* at 295.[8]

Matthew J. Severin, Jr., J.D., Ph.D., an epidemiologist and clinical microbiologist, opined at his January 1, 1988 deposition that

the children show no sign of either bacterial, mycotic or viral infection that could

have led to their condition, to their status as mentally retarded.... And it appeared to me that there was a possible either point mutation or mutagenesis that occurred at the germinal cell layer to cause what happened to them. I saw no evidence of other chemical or other microbiological or physical, such as radiation, that could lead me to that conclusion.

*Id.* at 302.

In his March 27, 1989 affidavit, Dr. Severin stated "to a reasonable degree of scientific certainty, that the mental retardation of the children in this case was a result of point mutation caused by the exposure of Laura Dunbar and/or Nord Sorensen to alfalfa tablets produced by Shaklee which were treated by ETO and contained degredation [sic] products of ETO." *Id.* at 1299–1300.

Subsequently, however, Dr. Severin testified at his June 24, 1992 deposition that he could say only that EtO was a "possible cause," *id.* at 1004, and that, due to lack of information, he could not testify "that there is any relationship between [EtO] and mental retardation in this case," *id.* at 315–16, 320. In rejecting the alternative explanation that the children's mental retardation was non-specific as to causation, Dr. Severin based his opinion upon their "almost identical symptomatology." *Id.* at 1032.

William Kimberling, M.D., a geneticist and division director of the Center for Hereditary Communication Disorders at Boys Town National Research Hospital, also testified on behalf of the plaintiffs. At his September 2, 1992 deposition, he stated that "[g]iven exposure, ... it is reasonable to presume that the ethylene oxide caused a mutation and that that mutation resulted in the children's prob-

---

7. A "mutagen" causes genetic mutations in the parents that can affect offspring, whereas a "teratogen" causes malformation of the fetus *in utero.*

8. Epidemiology is an accepted scientific discipline dealing with the integrated use of statistics and biological/medical science. "Epidemiology is a statistical method used to compare the incidence of a particular disease in the population at large with the incidence of the disease in a population that has been exposed to a particular chemical." Daniel Riesel, *Motions in Limine in Toxic Tort and Environmental Litigation,*

446PLI/Lit 563. The goal of epidemiologic investigation is to identify and establish the causes of human diseases, yet such studies may only report an association between an injury or disease and a specific exposure, which is not necessarily one of cause and effect. "[I]n an individual case, epidemiology cannot conclusively prove causation; at best, it can establish only a certain probability that a randomly selected case of disease was one that would not have occurred absent exposure...." Steve Gold, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion, and Statistical Evidence,* 96 Yale L.J. 376, 380 (1986) (footnote omitted).

lems." *Id.* at 935; *see also id.* at 375–77. Dr. Kimberling could not testify, however, to a reasonable degree of medical certainty, that the ethylene oxide caused the mental retardation in this case. *Id.* at 935–36. He further stated that if the tablets did not retain any EtO, they would not be the cause, and that he had no evidence of retention of EtO in any of Shaklee's alfalfa tablets. *Id.* at 399.

Carol Remmer Angle, M.D., a physician, professor of pediatrics and director of the clinical toxicology program at the University of Nebraska, assumed exposure at 3000 ppm per tablet "ECH" (based upon the highest level of *ETCH* detected from the 1974 batch of fumigated tablets) in concluding that Laura had consumed .24 milligrams "ECH" per kilo per day. *Id.* at 617. Dr. Angle later conceded that there was no evidence that the compounds contained ethylene oxide. *Id.* at 842.

Dr. Angle testified that she was unaware of human oral toxicity from ethylene oxide-sterilized foods, *id.* at 328, or that ethylene oxide-sterilized foods caused teratogenic effects, *id.* at 329. While stating that "it is not scientifically unreasonable to consider that [EtO] is a possible cause of the mental retardation of these children," *id.* at 1493–94, Dr. Angle did not have an opinion as to what actually caused plaintiffs' mental retardation, and averred she did not have enough information to eliminate other possible causes, *id.* at 347. She agreed that in the field of toxicology, normally one would require some experimental evidence, the ability to replicate experimental results, and a reasonable mechanism to explain the effect before a scientific conclusion of causation is justified. *Id.* at 578.

One study relied upon by plaintiffs' experts summarizes the following effects relative to EtO exposure[9]: it is carcinogenic in rats and mice whether administered intragastric, subcutaneous injection, or by inhalation, *id.* at 284–85; studies in humans *suggest* an association between EtO exposure and an in-

creased incidence of cancer, *id.* at 285; it produces adverse reproductive and teratogenic effects in studies with mice, rats, rabbits, and monkeys, which were more pronounced when injected rather than inhaled, *id.;* and it is a direct-acting mutagen that *may* be capable of causing heritable genetic damage in man, *id.*

Additionally, Dr. Angle reviewed translations from two Russian studies, one on the question of mutation effect of ethylene oxide in mammals, and the other on the maximal permissible concentration of ethylene chlorohydrin in water sources. Dr. Angle did not review the studies for their methodological or evaluative accuracy. The studies reported that both ethylene oxide and ethylene chlorohydrin are mutagenic in rats at considerably less than at lethal doses. *See id.* at 300. Dr. Angle thereby concluded that "These estimated intakes of ECH by both the mother and father are, respectively, 4.8x and 3.4x the human mutagenic dose predicted by animal data. The data support the probability that the oral doses of ECH ingested by the parents of the Swanson [sic] children were mutagenic." *Id.*

### (2) Defendants' experts

Defendants presented affidavits from four witnesses who were experts in their respective fields of toxicology and pharmacology, epidemiology, clinical psychiatry and pediatrics. All of these experts concluded, to a reasonable degree of scientific certainty, based on the facts and scientific methodology appropriate to their respective disciplines, that the parents' ingestion of ethylene oxide or ethylene chlorohydrin, via the Shaklee alfalfa tablets, could not have caused plaintiffs' mental retardation. *Id.* at 409–10, 440, 461, 496.

Further, William Wadell, M.D., an academic toxicologist and pharmacist, testified at his February 14, 1989 deposition concerning EtO as an alkylating agent in cigarette smoke and of the alkylating agent in alcohol.

9. *See* Vicki L. Dellarco, Walderico M. Generoso, Gary A. Sega, John R. Fowle III, and David Jacobson–Kram, *Review of the Mutagenicity of Ethylene Oxide,* 16 Environmental and Molecular Mutagenesis 85 (1990); *see also* W.M. Generoso, J.C. Rutledge, K.T. Cain, Lori A. Hughes, and P.W. Braden, *Exposure to female mice to ethylene oxide within hours after mating leads to fetal malformation and death,* 176 Mutation Research 269 (1987).

Dr. Wadell concluded that based upon Laura Dunbar's self-reported cigarette and alcohol consumption during the pregnancies, she received more EtO and ethylene oxide derivatives from those sources than what she could possibly have received from the alfalfa tablets, even calculated at the level of 3000 ppm ETCH. *Id.* at 668–70.

## D. District Court Opinion

In determining that plaintiffs' proffered expert testimony did not make a case to establish causation, the district court stated:

As a preliminary matter, the three experts' testimony that Shaklee's ETO-treated alfalfa tablets are a 'possible cause' of plaintiffs' mental retardation (Severin), that it would be a 'reasonable conclusion' that the ETO-treated tablets are a cause (Kimberling), and that it is not scientifically 'unreasonable' or 'irresponsible' to consider them as a 'possible cause' (Angle), is simply not sufficient to establish the ETO-treated alfalfa tablets as a proximate cause of plaintiffs' mental retardation.

Dist.Ct.Op. at 7.

The district court further observed the inadequacies of Dr. Lynch's testimony, probably plaintiffs' witness with the most applicable testimony in plaintiffs' favor:

Plaintiffs' expert Lynch described his scientific process during his depositions:

[The Sorensen children are] a small sample, so you can't—you can't make a case on a small sample. But you use the cumulative evidence that you have available to you to make these deductions. So you have a family history that is not remarkable other than the two exposed subjects with similar phenotypes, you have the lack of consanguinity, you have data on the known potentially offending agent, the data being albeit at the infra-human level with respect to mutagenesis

and teratogenesis and you have inferential evidence at the human level relevant to sister-chromatid exchange, in other words, we—we know that it is an offending agent in that area, and you—we have the possibility, then, of fetal wastage, which I have alluded to, and then you—one attempts then to make certain scientific deductions based on—on that battery of information.

Dep. (7/6/92) at 124. Lynch did not perform any independent testing, *Id.* at 33, and has not found any study, even one involving animals, that shows a relationship between ingestion of ETO and mental retardation in offspring.

Lynch's application of studies involving *animals* showing mutagenicity and teratogenicity from *inhalation* of ETO, to show that *human ingestion* of ETO or ECH caused mental retardation in offspring, has not been tested, has not been subjected to peer review or publication, and no evidence of its general acceptance has been offered. Although no one of these factors is dispositive, taken together they cast significant doubt on the validity of Lynch's scientific process.

Dist.Ct.Op. at 10 (emphasis in original).

## II. ADMISSIBILITY OF THE SCIENTIFIC EVIDENCE

This case is controlled by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As interpreted by *Daubert*, Rules 702 and 703 of the Federal Rules of Evidence [10] provide our analytic framework to determine whether plaintiffs presented admissible evidence in opposition to defendants' motions for summary judgment.

In the *Daubert* litigation, two minor children born with limb reduction birth defects

---

10. Fed.R.Evid. 702 provides:
    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
    Fed.R.Evid. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

claimed that these defects resulted from their mother's ingestion of anti-nausea prescription drug, Bendectin.[11] In support of its motion for summary judgment in the district court, defendant submitted an affidavit from a physician/epidemiologist, an expert well-credentialed on the risks of exposure to various chemical substances. Having reviewed more than thirty published studies involving 130,000 patients, none of which found Bendectin to be a human teratogen, defendant's expert concluded that "maternal use of Bendectin during the first trimester of pregnancy has not been shown to be a risk factor for human birth defects." —— U.S. at ——, 113 S.Ct. at 2791. Plaintiffs did not challenge defendant's characterization of the published reports, but instead presented eight of their own impressively credentialed experts. Plaintiffs' experts concluded that Bendectin does cause birth defects, based upon *in vitro* (test tube) and *in vivo* (live) animal studies, pharmacological studies comparing the chemical structure of Bendectin to the chemical structures of other substances known to cause birth defects, and the " 'reanalysis' " of previously published epidemiological studies. *Id.* at 2791–92.[12] The district court granted defendant's motion for summary judgment. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 727 F.Supp. 570, 576 (S.D.Cal.1989).

The Ninth Circuit agreed with the district court, basing its affirmance on its adherence to the "general acceptance test" of the so-called Frye Rule[13]. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 951 F.2d 1128, 1130–31 (9th Cir.1991). Applying *Frye*, that court determined that plaintiffs' evidence provided insufficient foundation to permit the expert testimony on causation, relying in part on opinions of three other circuits[14]. *Daubert*, 951 F.2d at 1131. The Ninth Circuit also observed that plaintiffs' reanalysis of epidemiological studies did not meet the *Frye* standard because they had never been published and therefore had not received peer review scrutiny, and had been generated solely for use in litigation. *Id.*

The Supreme Court granted certiorari to determine the appropriate standard for admission of expert testimony. *Daubert*, —— U.S. at ——, 113 S.Ct. at 2792. In its decision, the Court unanimously rejected the Frye Rule, stating:

> Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention 'general acceptance,' the assertion that the Rules somehow assimilated *Frye* is unconvincing. *Frye* made 'general acceptance' the exclusive test for admitting expert scientific testimony. That austere standard, absent

---

**11.** Because of the birth defects allegedly resulting from Bendectin exposure, well over two thousand similar suits had been brought against Merrell Dow. Almost all the lawsuits resulted in no judgment for plaintiffs. Most Bendectin issues had been resolved by lower federal courts by the time the Supreme Court reviewed *Daubert. See* Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test*, 78 Minn. L.R. 1345, 1347 (1994) (citing *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1351 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992)).

**12.** "*In vitro* studies test teratogenicity by exposing single cells, organs, culture-maintained embryos, or limb buds to a suspect substance." Joseph Sanders, *From Science to Evidence: The Testimony on Causation in the Bendectin Cases*, 46 Stanford L.Rev. 1, 19 (Nov.1993) (footnote omitted).

"*In vivo* experiments test the effects of ingesting a suspect drug during pregnancy on fetuses of animals thought to be similar to humans." *Id.* at 20 (footnote omitted). Because of the dose-response differential between animals and hu-

mans, however, extrapolating to humans from animal studies is problematic.

Comparative studies are generally referred to as structure-activity or chemical structure comparisons. The problem with the structure-activity hypothesis is that "[m]olecules with minor structural differences can produce very different biological effects." *Id.* at 19 (footnote omitted).

**13.** *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), provided what is generally considered a more restrictive standard, requiring that "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

**14.** *See Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, *modified on reh'g,* 884 F.2d 166 (5th Cir.1989), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990); *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823 (D.C.Cir.1988), *cert. denied,* 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989); *Lynch v. Merrell–National Lab., Div. of Richardson–Merrell, Inc.*, 830 F.2d 1190 (1st Cir.1987).

from and incompatible with the Federal Rules of Evidence, should not be applied in federal trials.

*Daubert,* —— U.S. at ——, 113 S.Ct. at 2794 (footnote omitted).

Although the opinion might have ended at that point, as the dissent in *Daubert* noted, *id.* at ——, 113 S.Ct. at 2799 (Rehnquist, C.J., and Stevens, J., dissenting), the Blackmun opinion, joined by six other justices, also presented standards and goals to aid federal judges in their consideration of the admissibility of scientific evidence. Since *Daubert,* federal and state courts have applied Justice Blackmun's discussion to a broad range of

expert testimony in considering or resolving whether to admit the expert opinion evidence.[15]

Several propositions discussed by the Blackmun opinion in *Daubert* apply directly to our resolution of the admissibility issue. Initially, the Court observed:

> That the *Frye* test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial

**15.** *See, e.g., Carroll v. Morgan,* 17 F.3d 787 (5th Cir.1994) (standard of medical care); *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090 (7th Cir.) (opinion of radiation-induced cataracts), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994); *Pioneer Hi–Bred Int'l v. Holden Foundation Seeds, Inc.,* 35 F.3d 1226 (8th Cir.1994) (electrophoresis, liquid chromatography, and growout testing); *United States v. Johnson,* 28 F.3d 1487 (8th Cir.1994) (drug trafficking); *United States v. Jones,* 24 F.3d 1177 (9th Cir.1994) (voice identification technique); *United States v. Quinn,* 18 F.3d 1461 (9th Cir.) (photogrammetry to identify individual's height), *cert. denied,* —— U.S. ——, 114 S.Ct. 2755, 129 L.Ed.2d 871 (1994); *United States v. Muldrow,* 19 F.3d 1332 (10th Cir.) (identity and amount of cocaine), *cert. denied,* —— U.S. ——, 115 S.Ct. 175, —— L.Ed.2d —— (1994); *United States v. Lee,* 25 F.3d 997 (11th Cir.1994) (machine detecting trace amounts of cocaine); *United States v. Sepulveda,* 15 F.3d 1161 (1st Cir.1993) (economics of cocaine trade); *United States v. Locascio,* 6 F.3d 924 (2d Cir.1993) (organized crime families' structure and operation), *cert. denied,* —— U.S. ——, ——, 114 S.Ct. 1645, 1646, 128 L.Ed.2d 365 (1994); *United States v. Daccarett,* 6 F.3d 37 (2d Cir.1993) (money laundering scheme and techniques), *cert. denied,* —— U.S. ——, ——, ——, 114 S.Ct. 1294, 1295, 1538, 127 L.Ed.2d 648 (1994); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224 (3d Cir.) (economic testimony), *cert. denied,* —— U.S. ——, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993); *United States v. Bynum,* 3 F.3d 769 (4th Cir.1993) (chromatographic analysis of cocaine samples), *cert. denied,* —— U.S. ——, 114 S.Ct. 1105, 127 L.Ed.2d 416 (1994); *United States v. Bonds,* 12 F.3d 540 (6th Cir.1993) (DNA); *Elkins v. Richardson–Merrell, Inc.,* 8 F.3d 1068 (6th Cir.1993) (Bendectin-induced birth defects), *cert. denied,* —— U.S. ——, 114 S.Ct. 1299, 127 L.Ed.2d 651 (1994); *Cantrell v. GAF Corp.,* 999 F.2d 1007 (6th Cir.1993) (cause of asbestosis); *Porter v. Whitehall Lab., Inc.,* 9 F.3d 607 (7th Cir.1993)

(ibuprofen-induced kidney failure); *Wilson v. City of Chicago,* 6 F.3d 1233 (7th Cir.1993) (effects of electroshock treatments), *cert. denied,* —— U.S. ——, 114 S.Ct. 1844, 128 L.Ed.2d 470 (1994); *Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183 (7th Cir.1993) (valuation of corporations' partnership interest); *Cella v. United States,* 998 F.2d 418 (7th Cir.1993) (cause of polymyositis); *United States v. Martinez,* 3 F.3d 1191 (8th Cir.1993) (DNA), *cert. denied,* —— U.S. ——, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994); *United States v. Amador–Galvan,* 9 F.3d 1414 (9th Cir.1993) (unreliability of eyewitness testimony); *United States v. Markum,* 4 F.3d 891 (10th Cir. 1993) (cause of fire); *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549 (D.C.Cir.1993) (future earning capacity); *City of Fargo v. McLaughlin,* 512 N.W.2d 700 (N.D.1994) (horizontal gaze nystagmus (HGN) test); *State v. Hofer,* 512 N.W.2d 482 (S.D.1994) (intoxilyzer); *Wilt v. Buracker,* 443 S.E.2d 196 (W.Va.1993) (economic damages), *cert. denied,* —— U.S. ——, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994); *State v. Foret,* 628 So.2d 1116 (La.1993) (Child Sexual Abuse Accommodation Syndrome (CSAAS)); *State v. Cressey,* 137 N.H. 402, 628 A.2d 696 (1993) (sexual abuse); *State v. Alberico,* 116 N.M. 156, 861 P.2d 192 (1993) (Post–Traumatic Stress Disorder (PTSD)); *Clement v. Griffin,* 634 So.2d 412 (La. Ct.App.1994) (cause of accident); *Reese v. Stroh,* 74 Wash.App. 550, 874 P.2d 200 (1994) (medical); *Nelson v. State,* 628 A.2d 69 (Del.Super.Ct.1993) (DNA); *State v. Futch,* 123 Or.App. 176, 860 P.2d 264 (1993) (DNA).

As the citations above illustrate, *Daubert*'s rationale has been applied to both scientific evidence and technical issues calling for expert opinions. The Supreme Court has also suggested a broad application of *Daubert. See Rincon v. United States,* —— U.S. ——, 114 S.Ct. 41, 126 L.Ed.2d 12 (1993) (vacating case below, 984 F.2d 1003 (9th Cir.), and remanding for a determination of the admissibility of expert testimony on the issue of the reliability of eyewitness identification, in light of *Daubert* ), *appeal after remand,* 28 F.3d 921, (9th Cir.1994).

judge must ensure that any and all scientific testimony or evidence admitted is not only *relevant,* but *reliable.*

—— U.S. at ——–——, 113 S.Ct. at 2794–95 (footnote omitted) (emphasis added). In explaining the "relevancy" prong, the Blackmun opinion relates:

Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, nonhelpful.' 3 Weinstein & Berger ¶ 702[02], p. 702–18. *See also United States v. Downing,* 753 F.2d 1224, 1242 (CA3 1985) ('An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute'). The consideration has been aptly described by Judge Becker as one of 'fit.' *Ibid.* 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. *See* Starrs, *Frye v. United States* Restructured and Revitalized: A Proposal to Amend Federal Evidence Rule 702, and 26 Jurimetrics J. 249, 258 (1986). The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

—— U.S. at ——, 113 S.Ct. at 2795–96. The Court continued:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a)[16], whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at ——, 113 S.Ct. at 2796 (footnotes omitted).

■ The expert testimony proposed by plaintiffs in this case fails to qualify for admissibility as "relevant." Plaintiffs produced no evidence showing or providing a reliable inference that the Shaklee alfalfa tablets taken by their parents contained any EtO residue.

■ We also need to consider the "scientific validity" of the submission—as put in *Daubert:*

The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id.* at ——, 113 S.Ct. at 2797 (footnote omitted).

*Daubert* sets out a list of non-exhaustive factors relevant to, but not necessarily determinative of, a district judge's determination whether the expert will testify to relevant,

---

16. Rule 104(a) provides:

**Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [relating to relevancy conditioned on fact]. In making its determination it is not bound by the rules of evidence except those with respect to privileges.

We note that recent amendments to the federal discovery rules, e.g., Fed.R.Civ.P. 16 and 26, require an early and full evaluation of these evidentiary problems.

"scientific knowledge." *Id.* at ——, 113 S.Ct. at 2796–97. These factors include:

1. Whether the theory can be and has been tested.

Here, neither of Dr. Lynch's potential causal mechanisms, "a germ line mutation," or "a multi-factorial induced phenomenon," App. at 1247–48, or Dr. Severin's theory of "a point mutation," *id.* at 1299–1300, due to the ingestion of EtO residue, have been studied. While plaintiffs' experts understandably state that conducting such a study on humans would be unethical, they fail to address the absence of animal studies demonstrating the incidence of EtO-sterilized food products and mental retardation.[17]

2. Whether the theory has been subjected to peer review and publication.

Plaintiffs' experts have not subjected their theories to peer review[18] or publication.

3. As to a particular scientific technique, the court should consider the known rate of error.

This principle does not apply here because the testimony advanced involved theories and not any particular technique.

4. Generally, acceptance can yet have a bearing on the inquiry.

No evidence has been presented of any general acceptance of either the theory or methodology presented by the plaintiffs' experts.

Here, the hypotheses presented by plaintiffs' experts follow no scientific principles. Those opinions reason that, because Kristofer and Katrina sustained birth defects (men-tal retardation) and their parents used Shaklee's alfalfa tablets, and because some alfalfa tablets had contained an EtO residue, the parents must have ingested the EtO residue tablets. That inference turns scientific analysis on its head. Instead of reasoning from known facts to reach a conclusion, the experts here reasoned from an end result in order to hypothesize what needed to be known but what was not.

While it may be that this sort of reasoning could pass muster in some cases where the obvious result explains the etiology (for example, where a fractured bone accompanied by bruised outer skin and flesh demonstrate that some type of physical contact caused the injury) such reasoning cannot apply here where several possible causes could have produced one effect. As the district court noted:

> Furthermore, Lynch also has made several assumptions that are not supported in the record (e.g., that plaintiffs' parents were not exposed to any other substances which have the ability to produce mutagenic or teratogenic effects; that no other agent containing ETO, such as Laura's cigarette smoking, could be a cause; and that the tablets plaintiffs' parents ingested contained ETO or ECH, and at sufficient levels to be mutagenic or teratogenic). Therefore, Lynch's process or technique is subject to great potential for error.

Dist.Ct.Op. at 10.

The Seventh Circuit dealt with a somewhat similar scientific inference in *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir.1994). There the plaintiff's medical expert opined that plaintiff's cataracts had

---

**17.** Plaintiffs' studies indicate that EtO is carcinogenic in rats and mice whether administered intragastric, subcutaneous injection, or by inhalation, and may be associated with an increased incidence of cancer in humans, produces adverse reproductive and teratogenic effects in studies with mice, rats, rabbits, and monkeys, and is a direct-acting mutagen that may be capable of causing heritable genetic damage in man. *See* Vicki L. Dellarco, Walderico M. Generoso, Gary A. Sega, John R. Fowle III, and David Jacobson-Kram, *Review of the Mutagenicity of Ethylene Oxide*, 16 Environmental and Molecular Mutagenesis 85 (1990); *see also* W.M. Generoso, J.C. Rutledge, K.T. Cain, Lori A. Hughes, and P.W. Braden, *Exposure to female mice to ethylene oxide within hours after mating leads to fetal malforma-tion and death*, 176 Mutation Research 269 (1987). The validity of the two Russian studies upon which plaintiffs also rely, indicating that EtO has mutation effects on mammals, has been questioned.

**18.** While we acknowledge that peer review is not conclusive as to the merits of the scientific theory or technique, *see* Ron Simon, *High Court Throws Out Rigid Rules Excluding Scientific Evidence, Says Focus Must Be On Methods, Principles*, Toxic Law Reporter, BNA, Vol. 8, No. 9, Part II, at 6–7 (Summer/Fall 1993) (setting forth shortcomings of peer review), we do not believe peer review to be an empty gesture.

been caused by overexposure to radiation from defendants' nuclear power plant. The opinion rested on the expert's observation and opinion, but otherwise was unsupported by any scientific methodology. None of the scientific articles cited by the witness indicate that radiation-induced cataracts can be identified by mere observation. In rejecting the testimony, the court added:

> He has not produced any personal study or experiments that otherwise would justify his conclusions that Mr. O'Conner's cataracts are radiation-induced. Indeed, his familiarity with the effects of radiation generally is limited. Dr. Scheribel's opinion has no scientific basis and, consequently, the district court correctly ruled that Dr. Scheribel's testimony is inadmissible.

*Id.* at 1107 (footnotes omitted).

A similar result was obtained in *Porter v. Whitehall Laboratories, Inc.,* 9 F.3d 607 (7th Cir.1993), which involved a product liability action for damages allegedly caused by ingesting ibuprofen. Plaintiff, while awaiting surgery on a toe he injured at work, received samples of Motrin, a prescription form of ibuprofen, and Vicoden, a form of acetaminophen, from his internist's nurse practitioner. Plaintiff took the Motrin, as well as over-the-counter strength ibuprofen, for pain relief. Subsequently plaintiff returned to his internist's office, experiencing kidney failure that required a transplant. The experts provided two theories to explain plaintiff's kidney failure: (1) rapidly progressive glomerulonephritis (RPGN), due to anti-glomerular basement membrane glomerulonephritis (anti-GBM), or (2) unspecified RPGN, either caused by the process of anti-GBM or membranoproliferative glomerulonephritis (MPGN). Applying *Daubert,* the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the defendant pharmaceutical companies, holding that the expert testimony was properly excluded for lack of grounding in the scientific method. *Porter,* 9 F.3d at 614.

In this case the district court made pertinent observations that the plaintiffs' experts addressed none of the considerations relating to scientific validity. The testimony proffered by plaintiffs was not derived from the application of any reliable methodology or principle. Despite plaintiffs' protestations to the contrary, we conclude that the district court properly held the testimony inadmissible irrespective of the experts' conclusions.

*Daubert* does not require proof with certainty. It does require that expert testimony be relevant and reliable. — U.S. at ——, 113 S.Ct. at 2795. We note two cases, one clearly in the scientific area, the other in the general area of expert evidence, which illustrate difficult admissibility questions under the rubric of *Daubert.*

In *Cantrell v. GAF Corporation,* 999 F.2d 1007 (6th Cir.1993), plaintiffs presented expert testimony that their injuries (both had asbestosis and Cantrell had laryngeal cancer as well) resulted from exposure to asbestos. The expert based his opinion on examination of the plaintiffs, previous diagnoses of three individuals with laryngeal cancer out of 150 workers at the same plant (where in the general population the incidence rate is about 4 per 100,000 individuals per year) and that, in regard to Cantrell, the combination of his cigarette smoking and asbestos exposure worked in a synergistic fashion. The Sixth Circuit majority upheld the admission of plaintiffs' expert testimony, concluding that Rules 702 and 703 and *Daubert* do not prohibit an expert "from testifying to confirmatory data, gained through his own clinical experience, on the origin of a disease or the consequences of exposure to certain conditions." *Cantrell,* 999 F.2d at 1014. Reluctantly Judge Wellford concurred, though he considered plaintiffs' expert's testimony erroneously admitted as challenged. Plaintiffs' expert testified

> about the "highly unusual" incidence (in [the expert's] opinion) of laryngeal cancer among workers at the Lockland facility, which presented (to him) "stark, striking" evidence. This was akin to permitting a witness to give expert testimony against a railroad that a railroad crossing was dangerous and risky because he knew about two or three prior accidents at that location and this was "highly unusual."

*Id.* at 1019.

In *Robinson v. Missouri Pacific Railroad Company,* 16 F.3d 1083 (10th Cir.1994), the

Tenth Circuit upheld the district court's discretionary admission, solely for illustrative purposes, of an accidentologist's testimony as to the probable position of a vehicle and train at the moment of collision at a railroad crossing. The Tenth Circuit also upheld the district court's decision permitting the accidentologist to present a videotape of a model train and automobile colliding. The opinion commented on the limited objection made to the testimony under Fed.R.Evid. 403, observing that "trial judges should carefully and meticulously examine proposed animation evidence for proper foundation, relevancy and the potential for undue prejudice." 16 F.3d at 1088. In heeding the import of *Daubert,* the court further observed that while "the physical phenomena of crash movements may be explained on scientific principles[,]" offering an opinion that a car struck at an angle will necessarily leave the railroad tracks on impact may fall outside the realm of scientific knowledge. *Id.* at 1089.

The application of *Daubert* to difficult admissibility questions concerning expert testimony, such as those illustrated by the above cases, remains subject to development in the courts.

Finally, the *Daubert* opinion reminds district judges that when necessary they may themselves seek expert assistance in their "gatekeeper" functions by resorting to Rule 706 which "allows the court at its discretion to procure the assistance of an expert of its own choosing." — U.S. at ——, 113 S.Ct. at 2798.

### III. SUFFICIENCY OF THE EVIDENCE

■ Viewing the evidence in the light most favorable to the non-moving party, we agree that plaintiffs' evidence is insufficient as a matter of law to establish the requisite element of causation. Plaintiffs fail to establish that the alfalfa tablets consumed by Nord Sorensen and/or Laura Dunbar con-

tained EtO residue, or that human consumption of EtO-sterilized products causes mental retardation.

### IV. CONCLUSION

For reasons stated by the district judge and supplemented by this opinion, we affirm the summary judgment of dismissal.[19]

---

**19.** In fact, no record of the entry of a judgment is disclosed in the records of this case. The order granting summary judgment is not the final order to be entered in this case. However, the parties have proceeded as though a summary judgment had been entered and we shall not dismiss the appeal on this technicality. However, a careful appellant should not take a chance that this court will not dismiss an appeal for want of the entry of a final judgment, which is the final order in a case which is terminated as the result of a summary judgment motion.