# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00225-CV

**Alcides Cairus, M.D., Individually and d/b/a Alcides Cairus, M.D., P.A., Appellant**

**v.**

**Rosemary Gomez and Jesse Gomez, Appellees**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. 02-0711, HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Dr. Alcides Cairus liable for medical negligence in connection with surgery he performed on Rosemary Gomez and returned a verdict awarding her $15,000 for past pain and mental anguish, $15,000 for future pain and mental anguish, $23,255.09 for past medical expenses, and $9,027 for future medical expenses, for a total of $62,282.09 in actual damages. The trial court overruled Cairus's motions for new trial and for judgment notwithstanding the verdict, and entered judgment in accordance with the jury's verdict. The trial court awarded Gomez $10,245.45 in prejudgment interest and $1,901.41 in costs of court, resulting in a total judgment of $74,428.95. Cairus argues on appeal that the trial court erred by finding Gomez's expert report sufficient, admitting the testimony of Gomez's expert and a treating physician, denying Cairus's motions for summary judgment and judgment notwithstanding the verdict, submitting certain questions to the jury despite the lack of evidence supporting them, and admitting certain portions of

Gomez's testimony. We reverse the jury's award of damages for future pain and mental anguish because we hold that there was no evidence to support it. We affirm the trial court's judgment in all other respects.

**BACKGROUND**

Gomez began seeing Dr. Cairus, a general surgeon with a family practice in San Marcos, in March 1994. Cairus diagnosed Gomez with menometrorrhagia,[1] anemia, an enlarged uterus, an ovarian cyst, chronic endometritis,[2] urinary incontinence, and a second-degree rectocele.[3] After nonsurgical treatment failed to correct these conditions, Cairus suggested surgery. Gomez agreed, and after having her sign an informed consent form, Cairus performed a hysterectomy, an oophorectomy,[4] a perineal repair,[5] a bladder suspension, and an incidental appendectomy on Gomez on July 19, 1995.

Immediately after surgery, Gomez developed a fever and complained of nausea. Gomez continued to suffer from nausea and vomiting for approximately two months after the

---

[1] Menometrorrhagia is a condition involving "excessive uterine bleeding occurring both during the menses and at irregular intervals." *Dorland's Illustrated Medical Dictionary* 1128 (Douglas M. Anderson chief lexicographer, 30th ed. 2003) [hereinafter *Dorland's*].

[2] Endometritis is a condition characterized by inflammation of the mucous membrane lining the uterus. *Dorland's*, *supra* note 1, at 614.

[3] A rectocele is a "hernial protrusion of part of the rectum into the vagina." *Dorland's*, *supra* note 1, at 1597.

[4] An oophorectomy is a procedure removing an ovary or both ovaries. *Dorland's*, *supra* note 1, at 1310. Cairus removed both of Gomez's ovaries.

[5] The perineum is "the region between the thighs, bounded . . . in the female by the vulva and anus." *Dorland's*, *supra* note 1, at 1403.

surgery, but these issues resolved after Gomez was treated by a gastroenterologist for gastritis and a bacterial infection of the stomach. In May 1996, Gomez went to Cairus's office complaining of fever, nausea, vomiting, and left-side pain but was seen by another doctor. The doctor diagnosed Gomez with a strep throat infection.

On November 23, 2001, Gomez went to the Central Texas Medical Center emergency room because of right-side pain and fatigue. Doctors told Gomez that the hospital's diagnostic tests could not visualize her left kidney and instructed her to follow up with Dr. Ghassen Freiha, a urologist. Gomez followed the recommendation and made an appointment with Freiha, who took CT scans of Gomez's abdomen and pelvis, and concluded in December 2001 that she had a "hydronephrotic,[6] nonfunctioning, chronically obstructed left kidney and ureter."[7] Freiha expressed his initial opinion about the cause of the obstruction in a letter to Gomez's primary physician: "I am unsure as to the exact nature of the obstruction but it is most likely an iatrogenic[8] one, caused at the time of her hysterectomy in [1995]."

In January 2002, Gomez met with a lawyer for the first time. The attorney gathered Gomez's medical records, consulted with an expert, and in April mailed to Cairus the notice letter required by the former Medical Liability and Insurance Improvement Act (the Act). *See* Medical Liability and Insurance Improvement Act, 65th Leg., R.S., ch. 817, § 4.01, 1977 Tex. Gen. Laws

---

[6] Hydronephrosis is a condition involving "distention of the pelvis and calices of the kidney with urine, as a result of obstruction of the ureter." *Dorland's*, *supra* note 1, at 872.

[7] A ureter is "the fibromuscular tube that conveys the urine from the kidney to the bladder." *Dorland's*, *supra* note 1, at 1988.

[8] Iatrogenic means "resulting from the activity of physicians." *Dorland's*, *supra* note 1, at 903.

2039, 2047–48, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (current version at Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–.507 (West 2005 & Supp. 2006)).[9] Gomez and her husband, Jesse Gomez,[10] filed the plaintiffs' original petition in May 2002. They also filed an expert report with the petition, as required by the Act. *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01, 1995 Tex. Gen. Laws 985, 985–87. Dr. Bruce Halbridge, an obstetrician and gynecologist who practices in Houston, authored the report.

On March 17, 2003, Cairus moved to dismiss Gomez's lawsuit, arguing that Halbridge's expert report failed to sufficiently address the standard of care, the alleged breach of the standard of care by Cairus, and causation. *See id.*; *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873 (Tex. 2001). Gomez filed Halbridge's supplemented report on March 19, and the trial court denied Cairus's motion to dismiss.[11] Halbridge's supplemented expert report alleged, among other things, that Cairus departed from the standard of care by failing to perform adequate diagnostic testing to ensure that the bladder suspension procedure was necessary and by failing to carefully place the sutures during the bladder suspension surgery. The Burch bladder suspension procedure that Cairus performed on Gomez is used to treat urinary incontinence caused

---

[9] Because Gomez filed suit before September 1, 2003, the former act governs her claims. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 23.02(d), 2003 Tex. Gen. Laws 847, 899 (stating that prior law remains in effect for actions filed before September 1, 2003).

[10] Jesse Gomez was a plaintiff, but the jury failed to award him any damages on his loss of consortium claim. For the duration of the opinion, our use of the name Gomez refers to Rosemary Gomez unless otherwise noted.

[11] While the record contains no documentation of the trial court's ruling on Cairus's motion to dismiss, we presume the court denied it because the case proceeded to final judgment and because Cairus complains of the denial of his motion to dismiss on appeal.

by pregnancy. The operation involves attaching paravaginal tissue to a pelvic ligament in an effort to lift up the area where the urethra meets the bladder, restoring the angle of the bladder neck to its prepregnancy position. Halbridge alleges that Cairus placed a suture above the urethrovesical junction,[12] a departure from the standard of care. Halbridge wrote in his report, "The incorrect placement of the uppermost paravaginal suture on the left side of the urethra, during the Burch procedure, was such that the left ureter was occluded very likely adjacent to the bladder wall. The ligation of the left ureter resulted in the death of the left kidney."

In July 2003, Dr. Grady Bruce, a urologist, surgically removed Gomez's "dead" left kidney. The surgery was not urgent but was recommended by multiple urologists. A jury trial began on October 31, 2005, and the jury returned a verdict in favor of Gomez on November 4. This appeal followed.

## DISCUSSION

### Insufficient Expert Report

In his first issue, Cairus argues that the trial court erred by denying Cairus's motion to dismiss Gomez's case because of an insufficient expert report. Cairus argues that the report inadequately set out the standard of care, the alleged breach of the standard of care, and causation.

Even when the parties do not challenge appellate jurisdiction, we must inquire into our own jurisdiction. *M. O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004). This Court only has jurisdiction to review final orders and interlocutory orders specifically made appealable by

---

[12] The urethrovesical junction is where the urethra meets the urinary bladder. *Dorland's*, *supra* note 1, at 2036.

5

statute. *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). The order denying Cairus's motion to dismiss is not a final order because it does not dispose of all pending parties and claims, *see id.*, and it is not an appealable interlocutory order. *Academy of Oriental Med., L.L.C. v. Andra*, 173 S.W.3d 184, 187 (Tex. App.—Austin 2005, no pet.) (holding that an order denying a motion to dismiss a health-care liability claim for an insufficient expert report is not appealable); *cf.* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (allowing interlocutory appeal from the denial of a motion to dismiss a health-care liability claim for failure to timely serve an expert report), (10) (West Supp. 2006) (allowing interlocutory appeal of an order *granting* a motion to dismiss a health-care liability claim for inadequacy of the expert report). Accordingly, this Court lacks jurisdiction to consider Cairus's first issue.

**Admission of Expert Testimony**

### Dr. Halbridge

In his second issue, Cairus argues that the trial court erred by admitting the testimony of Gomez's expert, Dr. Halbridge, over Cairus's objection. Cairus contends that Halbridge is not qualified to offer expert testimony about the standard of care in performing Burch bladder suspensions because he does not perform them himself and has not been trained to perform them. Cairus insists that Halbridge's opinion about causation is speculative because he only reviewed Gomez's medical records dating back to 1994, his testimony was unsupported by studies or pathology, and he did not attempt to exclude other causes of Gomez's injury. Cairus asserts that Halbridge's testimony was logically inconsistent. Cairus also argues that specific portions of

6

Halbridge's testimony should not have been admitted because the opinions he expressed were not properly and timely disclosed to Cairus.

Texas Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In order to constitute specialized knowledge that will assist the trier of fact, proposed testimony must be relevant and reliable. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). The trial court makes the initial determination about whether the proffered expert testimony meets these requirements. *Id.*

The qualification of a witness as an expert is within the trial court's discretion. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). This Court will not reverse the trial court's exercise of discretion absent a clear abuse. *Id.* The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Id.*

Cairus argues that Halbridge is not qualified to provide expert testimony about Burch bladder suspensions because he "does not use the Burch method and was not trained in it." The record does not support this assertion. Halbridge testified that he is personally familiar with the Burch bladder suspension procedure that Cairus performed on Gomez. Halbridge testified that he uses the Marshall-Marchetti-Krantz bladder suspension technique, "which is the same operation [as the Burch bladder suspension]. Except for the very last stitch, both operations are virtually identical." Halbridge explained in his deposition, which Cairus attached as an exhibit to his motion to strike Halbridge's testimony, that the only difference between the Burch procedure and the

7

Marshall-Marchetti-Krantz procedure is that in the Marshall-Marchetti-Krantz procedure the paravaginal tissue is sutured to the periosteum[13] of the pubic bone while in the Burch procedure the paravaginal tissue is sutured to a pelvic ligament. Halbridge testified in his deposition and at trial that he was trained to do both the Marshall-Marchetti-Krantz procedure and the Burch procedure during his four-year residency and that he performs multiple bladder suspension surgeries every year. We hold that the trial court did not abuse its discretion by concluding that Halbridge had knowledge, skill, experience, training, or education in the Burch bladder suspension procedure that would assist the jury.

Cairus contends that Halbridge's opinion about causation is speculative because he only reviewed Gomez's medical records dating back to 1994, his testimony was unsupported by studies or pathology, and he did not attempt to exclude other causes of Gomez's injury. However, Halbridge testified that there are four major categories of causes of ureteral obstruction that he ruled out in Gomez's case:

A: The first is congenital; it means someone's born with a birth defect. They can have a pelvic kidney; a ureterocele, which is an outpocketing of the actual ureter; they can have a defect in the valves that prevent backflow from the bladder back up into the ureters; those are all congenital. I ruled those out because there's no evidence that this patient had any congenital problems.

The next category involves cancer. Cancer can obstruct organs and can obstruct ureters. But there's no cancer here; she never had any cancer and cancer is just not an issue in this case.

Q: Did they actually look for cancer later when they discovered the problem?

[13] Periosteum is "a specialized connective tissue covering all bones of the body." *Dorland's*, *supra* note 1, at 1405.

8

A:      Yes, they did.

Q:      And did they find any?

A:      No.    Then there's infection; tuberculosis, a parasitic disease called schistosomiasis, and other sources of infection such as pelvic abscess were not present.

I also ruled out benign causes such as large fibroid tumors or other tumors that aren't cancer, but can still compress the ureter.  I ruled that out.

And then there's a category of what they call miscellaneous causes such as aortic aneurysm and other things which just weren't present here.  She didn't have any other coexisting pelvic or abdominal disease that would have caused a problem for the ureter.

Halbridge also testified that he reviewed Gomez's medical records, including the two CT scans ordered by Dr. Freiha and an intravenous pyelogram[14] ordered by emergency room physicians, leading Halbridge to be "one hundred percent certain that it was the placement of the suture that caused the obstruction on that ureter."

Cairus points to studies indicating that ureteral injury rarely occurs in connection with gynecological surgeries[15] in support of his position that Halbridge's causation testimony was speculative.  However, we fail to see how the fact that gynecological surgeries rarely cause ureteral injury renders speculative an opinion that a particular gynecological surgery caused a specific ureteral injury.

---

[14] A pyelogram is "a radiograph of the kidney and ureter." *Dorland's*, *supra* note 1, at 1549.

[15] The exact statistic was a matter of dispute at trial.  All the witnesses agreed that ureteral injury occurred in less than six percent of gynecological surgeries.

Cairus insists that Halbridge's testimony about causation should not have been admitted because it was not supported by pathology, studies, urology or nephrology[16] experience, or education or training in the causes of kidney failure. Studies supporting causation have been required where the link between the action alleged and the injury suffered has not been established. *See, e.g.*, *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997) (holding that evidence of a causal link between the drug Bendectin and birth defects was insufficient). Here, none of the expert witnesses asserted that a ureteral obstruction could not cause the death of a kidney or that a suture could not cause a ureteral obstruction; rather, they disagreed about whether Cairus had actually placed a suture that caused Gomez's ureteral obstruction or whether there was some other cause.

Pathology of the obstructed portion of the ureter could have provided a definitive answer to this question. However, Dr. Bruce did not remove the obstructed portion of the ureter, rendering such pathology impossible. Bruce testified that he did not remove the obstructed portion of the ureter because it was not medically necessary and because the risks outweighed any potential benefits. Halbridge testified that, in his opinion, Cairus had caused Gomez's ureteral obstruction with a suture because the location of the obstruction is consistent with being caused by a misplaced suture during the Burch procedure and because he had ruled out all other causes of the obstruction by reviewing medical textbooks, other medical literature, and Gomez's medical records, and using

---

[16] Nephrology is the "scientific study of the kidney, its anatomy, physiology, pathology, and pathophysiology." *Dorland's*, *supra* note 1, at 1230.

his own extensive experience in surgery. We hold that this testimony was sufficiently reliable so that the trial court did not abuse its discretion by failing to exclude the causation opinion.

Cairus argues that Halbridge's testimony was not logically consistent because (1) he testified that the obstruction must have been acute but then admitted that Gomez did not exhibit the symptoms that an acute obstruction would cause, and (2) he testified that Gomez's postoperative symptoms should have led to the discovery of the obstruction but also testified that Gomez could not have discovered her injury before 2001.

Halbridge testified that if a suture completely ligated a ureter, there would be immediate, severe symptoms. However, he also testified that pulling a suture too tight during the bladder suspension procedure could kink a ureter. This kink could only partially obstruct the ureter, in which case the patient could be asymptomatic. Halbridge testified that a partial obstruction due to a kink was most likely what happened in Gomez's case.

Halbridge also testified that Cairus should have performed diagnostic testing in response to Gomez's postoperative symptoms of fever, nausea, and vomiting, despite the eventual discovery that the symptoms were caused by gastritis, because these symptoms are red flags indicating ureteral obstruction for a physician who has just performed a bladder suspension and other gynecological surgeries. Halbridge testified that the failure to perform diagnostic testing, which enables a physician to discover ureteral obstruction at a time when it is easily fixed, was a departure from the standard of care. Halbridge went on to testify that Gomez could not have discovered her injury until 2001 because Cairus did not perform such testing, Gomez's postoperative symptoms resolved, and symptoms suggesting ureteral obstruction did not recur until 2001. Finding no logical

11

inconsistency in this testimony, we hold that the trial court did not abuse its discretion by failing to exclude it.

In his final complaint regarding Halbridge's testimony, Cairus argues that the trial court erred by failing to exclude Halbridge's testimony "as to whether endometriosis[17] was a likely cause of ureter obstruction and whether intraoperative dye tests should have been done because such opinions were not properly and timely disclosed to Defendants and did not meet the *Daubert/Robinson* criteria for admissibility." The record reflects that Cairus waived these arguments by failing to include them in his pretrial motion to strike Halbridge's testimony or to object to the testimony at trial. *See* Tex. R. App. P. 33.1(a) (providing that error is preserved by presenting the complaint to the trial court and obtaining an adverse ruling or a refusal to rule).

With respect to endometriosis, Halbridge testified on direct examination without objection:

Q:      If there was—assume with me that one of the defense's contentions is that maybe it was endometriosis that caused this problem. Do you agree or disagree with that?

A:      In this case I disagree.

Q:      And explain your answer, please.

A:      Endometriosis rarely affects the ureter. Very often when you have endometriosis affecting the ureter you have a significant amount of endometriosis and you can actually see it in the pelvis; you'll see different lesions. That did not occur here.

---

[17] Endometriosis is a condition in which tissue normally found in the lining of the uterus "occurs aberrantly in various locations in the pelvic cavity or some other area of the body." *Dorland's*, *supra* note 1, at 614.

12

Likewise, Halbridge testified concerning intraoperative dye tests:

Q:     Based on your education, training, and experience, are you familiar with whether there are procedures that can be done during surgery or after a surgery to make sure that there hasn't been a kinking or obstruction of the ureter?

A:     Yes.

Q:     And what are those procedures?

A:     There are two simple procedures. First, you can have the anesthesiologist inject some iodine dye into the patient's vein while she's still asleep and she's in the operating room, and you can put an x-ray plate underneath the table and actually take an x-ray to see that the ureters are open, that they're both draining in to the bladder, and the bladder is filling up; that's one.

       The other is to, after you've closed the patient, put the patient's legs up in stirrups and do a cystoscopy where we actually look inside the bladder. You have dye injected again into the patient's vein, and you can actually see the two holes where the ureters come in on either side of the back of the bladder and you should be able to see dye dripping out of those holes in about the same amount on both sides. Those are two ways you can determine that the ureters were not obstructed.

Q:     Were either of those two methods used by Dr. Cairus in this case?

A:     No.

Q:     Was anything done in this case to ensure that there wasn't some obstruction, kinking, or damage to Rosemary's ureter?

A:     No.

Q:     And should something have been done?

A:     Yes.

Q:     Is that what the standard of care requires?

13

A:     Yes.

Q:     And had either of those tests been done, would—is it likely that her obstruction to the ureter would have been discovered?

[Defense Counsel]:     Objection, Your Honor.

Although defense counsel's objection was never ruled on, the question objected to was never answered. Because he failed to object to this testimony in his pretrial motion to strike expert testimony or at trial, we hold that Cairus waived this complaint on appeal. We overrule Cairus's second point of error.

### *Dr. Bruce*

In his third point of error, Cairus argues that the trial court erred by admitting the testimony of Dr. Bruce, the urologist who surgically removed Gomez's left kidney. Cairus claims that Bruce is not qualified to opine about the standard of care at the time of Gomez's surgery in 1995 because Bruce was still in his residency training in 1995. Cairus asserts that Bruce's opinion that cystoscopy during or after the surgery likely would have revealed the ureteral obstruction is "baseless." Cairus contends that Bruce's testimony about diagnostic testing was irrelevant because "the diagnostic test did not itself cause an injury and could not have prevented injury to the ureter from scarring that developed over time." Cairus insists that Bruce's opinion about causation is speculative because there was no pathology of the obstructed portion of the ureter and because two defense witnesses stated that one could not determine whether a surgical error caused the obstruction without pathology. Also, Cairus argues that Bruce's testimony was unreliable because he was a treating physician.

14

The Act set out specific requirements for qualifying expert witnesses who testify on the issue of whether the defendant departed from the standard of care in health-care liability claims. *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 2, sec. 14.01(a), 1995 Tex. Gen. Laws 985, 988. The Act required that to be qualified as such an expert, a person must be a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id.* The Act also provided that, in determining whether a doctor is qualified on the basis of training or experience, the trial court shall consider whether, at the time the testimony is given or at the time the claim arose, the doctor "is board certified . . . in an area of medical practice relevant to the claim" and is "rendering medical care services relevant to the claim." *Id.* sec. 14.01(c).

It is unquestioned that, at the time of his testimony, Bruce was a practicing, board-certified urologist and had written thirteen publications and sixteen abstracts relating to urology. Bruce testified that in 1995 he had performed one bladder suspension with his attending physician in training and was treating ureteral obstruction on a daily basis. Bruce was in a residency program in 1995, being trained on the current standards of care for urology. Bruce testified that, at the time of his deposition, he performed around four Burch bladder suspension procedures per year and around two operations treating urinary incontinence per week. We hold that, based on this testimony, the trial court did not abuse its discretion by concluding that Bruce was qualified under

15

the Act to testify as an expert witness with respect to the standard of care for Burch bladder suspensions in 1995.

Cairus insists that Bruce's opinion that cystoscopy during or after the surgery likely would have revealed the ureteral obstruction is "baseless." Cairus only partially preserved this argument for review. Bruce testified without objection that, in general, cystoscopy can be used to identify a kinked ureter. Cairus objected when Bruce was asked whether a cystoscopy performed after Gomez's surgery would have discovered her ureteral obstruction; whether Gomez's ureter was kinked immediately after her surgery is the point for which Cairus preserved error. *See* Tex. R. App. P. 33.1(a). Bruce testified that he based his opinion that Gomez's ureter was kinked immediately after surgery on his training, experience, review of all the medical records in the case, and exclusion of all other possible causes of the obstruction. Bruce testified that because he concluded that Cairus caused a kink that partially obstructed Gomez's ureter and because cystoscopy is used to discover obstructed ureters, the test would have discovered Gomez's ureteral obstruction and Cairus departed from the standard of care by failing to perform the test. We hold that the trial court did not abuse its discretion by overruling Cairus's objection to this portion of Bruce's testimony as speculation.

Cairus contends that Bruce's testimony about diagnostic testing was irrelevant because "the diagnostic test did not itself cause an injury and could not have prevented injury to the ureter from scarring that developed over time." Cairus did not present this complaint to the trial court in his pretrial motions to strike expert testimony or at trial during Bruce's testimony. Accordingly, Cairus waived this argument. *See id.*

16

Cairus argues that Bruce's causation opinion is speculative because it is not supported by pathology. Cairus points to the testimony of two defense witnesses stating that it is impossible to determine whether a surgical error caused Gomez's injury without pathology of the obstructed portion of the ureter. However, Bruce and Halbridge both testified that they were able to determine that a surgical error caused Gomez's injury without pathology, to degrees of confidence of ninety-eight percent and one hundred percent, respectively. Bruce testified that he did not remove the obstructed portion of Gomez's ureter, which would have made it available for pathology, because it was not medically necessary and because the risks involved outweighed any potential benefits. Bruce stated that he relied on his surgical experience and training, as well as a review of Gomez's medical records, in forming his opinion about the cause of Gomez's obstructed ureter. He testified that he was able to exclude Gomez's prior tubal ligation, a tumor, cancer, abdominal adhesions, internal scarring, endometriosis, congenital obstruction, and kidney stones as causes of Gomez's ureteral obstruction. On these facts, we hold that the trial court did not abuse its discretion by failing to exclude Bruce's causation testimony.

Cairus insists that Bruce's testimony was unreliable because he was one of Gomez's treating physicians. Cairus cites to cases excluding testimony of treating physicians. *E.g.*, *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106–07 (7th Cir. 1994) (upholding the exclusion of a doctor's proffered testimony that he knew what radiation-induced cataracts look like because there was no scientific evidence that radiation-induced cataracts could be diagnosed by visual examination); *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614–15 (7th Cir. 1993) (upholding the exclusion of the testimony of multiple doctors, including one who stated that she did not have the

17

"inclination" to perform the research necessary to offer a scientific opinion, one that admitted that he could not state his causation opinion to "a reasonable degree of scientific certainty," one who agreed that his causation opinion was a "hypothesis, the proof of which remains to be made," and one who admitted that his conclusion was outside his area of expertise); *Robinson*, 923 S.W.2d at 559 (holding that a doctor's "failure to rule out other causes of the damage renders his opinion little more than speculation"). These cases are inapposite. As explained above, none of the doctors in this case disputed that a suture can obstruct a ureter or that a ureteral obstruction can cause a "dead" kidney. Also, Bruce reviewed all of Gomez's available medical records and excluded all other possible causes. We hold that the trial court did not abuse its discretion by failing to exclude Bruce's testimony. We overrule Cairus's third point of error.

**Denial of Motions for Summary Judgment and for Judgment Notwithstanding the Verdict**

In his fourth issue, Cairus argues that the trial court erred by overruling his motions for summary judgment and for judgment notwithstanding the verdict because limitations barred Gomez's claims, Gomez presented no evidence of causation or damages, and Gomez's summary judgment evidence was insufficient. We do not reach any of the issues relating to the summary judgment motion because the denial of a summary judgment motion is not appealable. *Novak v. Stevens*, 596 S.W.2d 848, 849 (Tex. 1980); *Austin Indep. Sch. Dist. v. Gutierrez*, 54 S.W.3d 860, 862 (Tex. App.—Austin 2001, pet. denied); *cf.* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(5) (allowing appeal from the denial of a summary judgment motion that is based on the assertion of immunity by an officer or employee of the state or a political subdivision of the state), (6) (allowing appeal from the denial of a summary judgment motion that is based upon a claim against or defense

18

by a member of the electronic or print media arising out of the free speech provisions of the federal or state constitutions).

The only argument in this point of error not relating solely to the denial of a summary judgment motion is Cairus's claim that the trial court erred by overruling his motion for judgment notwithstanding the verdict because he conclusively proved his affirmative defense of limitations. Cairus asserts that many of Gomez's claims were essentially failure to diagnose claims and thus limitations started running on the date of surgery in 1995. Cairus also contends that the discovery rule, which Gomez pleaded in each iteration of her petition, does not apply to medical negligence cases and that Gomez should have pleaded the open courts provision of the Texas Constitution to overcome Cairus's affirmative defense of limitations. Gomez responds that because she asserted in her response to Cairus's motion for summary judgment that the statute of limitations was unconstitutional as applied to her due to the open courts provision, she met her burden of pleading.

We do not address Cairus's assertion that Gomez's claims were failure to diagnose claims because he did not present this argument to the trial court. *See* Tex. R. App. P. 33.1(a). Cairus argues that he conclusively proved his defense of limitations because the discovery rule does not apply to medical negligence cases. However, the supreme court has held that "*absent a violation of the open courts provision of the Texas Constitution*, section 10.01 abolished the discovery rule in cases governed by the Act." *Chilkewitz v. Hyson*, 22 S.W.3d 825, 829 (Tex. 1999) (emphasis added). So the controlling question is whether Gomez met her burden of raising the open courts provision.

A party seeking to avoid judgment as a matter of law on the affirmative defense of limitations on the grounds that the statutory limitations period violates the open courts provision has the burden of raising the issue in the trial court. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 222 (Tex. 2002). Invoking the open courts provision in response to a summary judgment motion is sufficient to satisfy this burden. *See Adams v. Gottwald*, 179 S.W.3d 101, 102 (Tex. App.—San Antonio 2005, pet. denied) (holding, in a case where the plaintiffs relied on the open courts provision but did not plead it in their petition, that the burden to raise the open courts provision "may be met—as it was here—by raising the challenge in a response to a motion for summary judgment"). Because Gomez properly raised the open courts provision in the trial court, Cairus had the burden to conclusively negate the application of the open courts provision to be entitled to judgment as a matter of law. *Simmons v. Healthcare Ctrs. of Tex., Inc.*, 55 S.W.3d 674, 678 (Tex. App.—Texarkana 2001, no pet.); *Voegtlin v. Perryman*, 977 S.W.2d 806, 811 (Tex. App.—Fort Worth 1998, no pet.); *Krueger v. Gol*, 787 S.W.2d 138, 140 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (op. on reh'g). *But see Boyd v. Kallam*, 152 S.W.3d 670, 676 (Tex. App.—Fort Worth 2004, pet. granted) (holding that if a party conclusively establishes that limitations bars the action, the burden shifts to the other party to show that there is a fact issue with respect to the open courts provision).

A statute violates the open courts provision if it cuts off an injured person's right to sue before the person has a reasonable opportunity to discover the wrong and bring suit. *Jennings v. Burgess*, 917 S.W.2d 790, 793 (Tex. 1996). Cairus did not conclusively negate Gomez's assertion that she did not have a reasonable opportunity to discover her injury within the two-year limitations

period. In fact, every doctor that was questioned on this issue, including Cairus himself, agreed that Gomez could not have discovered her injury before December 2001. Even if we were to hold that the burden is on Gomez to create a fact issue regarding the open courts provision, this testimony is sufficient to do so.

Cairus also argues that he is entitled to judgment as a matter of law on his limitations defense because Gomez presented no evidence that she filed suit within a reasonable time after discovering her injury, another requirement of the open courts provision. *See Shah v. Moss*, 67 S.W.3d 836, 847 (Tex. 2001). Cairus contends that whether Gomez filed suit within a reasonable time is a fact issue. While Cairus raised this issue in his motion for judgment notwithstanding the verdict, he did not request a jury question regarding whether Gomez filed suit within a reasonable time after discovering her injury, nor did he object to the lack of such a question in the jury charge. It is the court's charge that measures the sufficiency of the evidence when the opposing party fails to object to the charge. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Therefore, we need not address Cairus's argument that Gomez presented no evidence that she filed suit within a reasonable time after discovering her injury.

Cairus contends that the trial court erred by submitting a discovery rule question asking when Gomez should have discovered her injury. However, the question submitted was substantially similar to Cairus's proposed question,[18] and Cairus did not object to the submitted

---

[18] Cairus's proposed question asked, "On what date should Rosemary Gomez have known by exercising reasonable diligence of facts giving rise to her claim against Dr. Cairus?" The question included in the jury charge asked, "On what date should Rosemary Gomez have known, by exercising reasonable diligence, of the facts giving rise to her claim against Dr. Cairus, if any, for injury to her kidney?" Although Cairus also requested another question asking whether Gomez's injury was inherently undiscoverable and objectively verifiable, he does not argue on appeal that the trial court erred by failing to include this question in the jury charge.

question.  Accordingly, he has waived this argument on appeal.  *See* Tex. R. App. P. 33.1(a).  We overrule Cairus's fourth point of error.

**Jury Charge**

*Negligence*

In his fifth issue, Cairus argues that the trial court erred by submitting the negligence question to the jury because Gomez presented legally and factually insufficient evidence of the standard of care, how it was breached, and causation, and because Gomez's negligence was not submitted.  We need not address Cairus's arguments concerning the standard of care, breach of the standard of care, or causation because he did not object to the submission of the negligence question on these bases in the trial court.  *See id.*  In his reply brief, Cairus raises arguments concerning legal and factual sufficiency independent of the jury charge.  However, we do not consider arguments raised for the first time in a reply brief.  *In re M.D.H.*, 139 S.W.3d 315, 318–19 (Tex. App.—Fort Worth 2004, pet. denied).

Cairus argues that Gomez's contributory negligence should have been submitted to the jury because there was evidence that Gomez had multiple urinary tract infections for more than twenty years before the surgery in question for which she failed to seek treatment, which could have caused her ureteral obstruction.  We do not address this argument because Cairus did not present it to the trial court.  *See* Tex. R. App. P. 33.1(a).  When requesting an instruction on contributory negligence from the trial court, Cairus only pointed to testimony by a doctor who saw Gomez after her kidney was removed stating that Gomez had not attended needed follow-up appointments, which may have exacerbated her medical condition at that time.  We hold that the trial court correctly refused to include the contributory negligence question in the charge on this basis because Cairus

22

presented no evidence that actions taken by Gomez after her kidney was removed could have contributed to the death of her kidney, the injury alleged. *See, e.g.*, *Edwards Transfer Co. v. Brown*, 740 S.W.2d 47, 50 (Tex. App.—Dallas 1987), *aff'd*, 764 S.W.2d 220 (Tex. 1988) (holding that proximate cause is an element of contributory negligence). We overrule Cairus's fifth point of error.

### *Damages*

In his sixth issue, Cairus argues that the trial court erred by submitting the damages question to the jury because Gomez presented legally and factually insufficient evidence of past and future medical expenses, future pain, and past and future mental anguish. We do not address the arguments related to past medical expenses or past mental anguish because Cairus did not object to the submission of the damages question on these bases in the trial court. *See* Tex. R. App. P. 33.1(a). Additionally, we do not address the arguments concerning factual insufficiency because it is not error for a trial court to submit a question supported by factually insufficient evidence to a jury. *Elboar v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992) ("A trial court may refuse to submit an issue only if no evidence exists to warrant its submission."); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983) ("The factual insufficiency of the evidence to support an affirmative answer to an opponent's issue furnishes no basis for refusal to submit the issue.").

To establish future damages, a plaintiff must present evidence that, in reasonable probability, she will incur expenses in the future and prove the probable reasonable amount of the future expenses. *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 654–55 (Tex. 1999). In a legal sufficiency review, we review all the evidence in the light most favorable to the verdict, indulging every reasonable inference in its favor. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005). If more than a scintilla of evidence supports the challenged

23

finding, we must uphold it against a no evidence challenge. *Id.* More than a scintilla of evidence exists where the evidence supporting the finding rises to a level that would enable reasonable people to differ in their conclusions. *Id.*

Cairus asserts that Gomez presented no evidence "that she would incur future medical expenses and why those costs were related to the ureter obstruction after the damaged kidney was already removed." However, Dr. Ellen Grimm, a nephrologist called to testify by Cairus, testified that because Gomez only has one kidney and because her other kidney had functioned inadequately in the past, she would need to go to the doctor often to follow up on her kidney. Grimm testified that Gomez "would need routine laboratory and follow up at least two to three times per year," and that this would cost approximately $100 for each office visit and $100 or more for each instance of laboratory testing. We hold that this testimony constituted more than a scintilla of evidence to support submitting a question on future medical expenses to the jury.

Cairus also argues that Gomez presented no evidence of future pain and mental anguish, two categories that were combined in the jury charge. With regard to future pain, Gomez points to testimony that she suffers from joint pain due to arthritis and that she should not take nonsteroidal anti-inflammatory medications for her arthritis because she only has one kidney. However, we find no evidence in the record that the medicine Gomez is required to take for her arthritis now is any less effective at treating pain. Gomez also points to evidence that if her remaining kidney's function falls below ten percent, she will have to undergo dialysis. However, all of the testimony indicated that this was merely a possibility; no one estimated the chances at what could be considered a reasonable probability.

24

With respect to future mental anguish, Gomez can only point to one sentence of her husband's testimony where he indicated that Gomez was "real frightened" at the prospect of having only one kidney. However, the question asked referred to the time immediately after Gomez learned that her left kidney had died, and Gomez limited his answer to the time period before her kidney was removed. This is no evidence of future mental anguish or of present mental anguish, which could support an inference of future mental anguish. We hold that Gomez presented no evidence of future pain or mental anguish and that the trial court erred by submitting that portion of the damages question to the jury. To that extent, we sustain Cairus's sixth point of error and reverse the portion of the judgment awarding damages for future pain and mental anguish; we overrule the remainder of Cairus's sixth issue.

**Admission of Gomez's Testimony**

In his seventh issue, Cairus argues that the trial court erred by failing to exclude Gomez's testimony that she had no pre-existing medical conditions and that she had been treated by physicians for urinary tract infections before 1995 because she did not produce medical records to that effect in discovery. Cairus claims that he preserved error in a pretrial motion to compel discovery. In that motion, Cairus requested that Gomez be compelled to produce medical records or, alternatively, be barred from testifying that she had no pre-existing medical condition. However, the trial court granted this motion, ordering Gomez to produce all medical records. Cairus failed to object to the testimony in question at trial. Accordingly, he waived his complaint on appeal. *See* Tex. R. App. P. 33.1(a). We overrule Cairus's seventh point of error.

**CONCLUSION**

Having found that Gomez presented no evidence to support the submission of future pain and mental anguish to the jury, we reverse that portion of the trial court's judgment and render

25

judgment that Gomez take nothing on her claims for future pain and mental anguish, reducing the trial court's judgment by $15,000 to a total of $59,428.95.[19] Having overruled Cairus's other issues, we affirm the trial court's judgment in all other respects.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Pemberton and Waldrop

Affirmed in part; reversed and rendered in part

Filed:   December 6, 2006

---

[19] We do not reduce the award of prejudgment interest because no prejudgment interest was awarded in connection with future damages.  *See* Tex. Fin. Code Ann. § 304.1045 (West 2006).